*1079 OPINION OF THE COURT
Thomas P. Phelan, J.
Plaintiff moved for an order, pursuant to Frye v United States (293 F 1013 [1923]), excluding the testimony of defense witness Dr. Jozef Urbas concerning the results of computer fire modeling utilized by Dr. Urbas. At the time the motion was made, plaintiff contended that Dr. Urbas utilized the computer fire modeling to determine the origin and cause of a fire that occurred at plaintiffs premises known as 168 North First Street, Bethpage, New York, on January 20, 2006. By short form order dated January 26, 2010 (Phelan, J), this court ordered a Frye hearing.
Pursuant to the Frye test, expert testimony based on scientific principles or procedures is admissible only after a principle or procedure has gained general acceptance in its specified field (People v Wesley, 83 NY2d 417, 422 [1994]). A particular procedure need not be unanimously endorsed by the scientific community but must be generally accepted as reliable (id. at 423). The Frye test emphasizes “counting scientists’ votes” rather than verifying the soundness of a scientific conclusion (Parker v Mobil Oil Corp., 7 NY3d 434, 447 [2006]).
In 1993, the United States Supreme Court decided Daubert v Merrell Dow Pharmaceuticals, Inc. (509 US 579 [1993]) which, in federal courts, displaced the Frye general acceptance standard based upon the Federal Rules of Evidence. The Frye general acceptance test, however, continues to be the standard for determining reliability and admissibility of expert testimony in New York (see People v Wesley, 83 NY2d at 423).
The burden of proof is on the party challenging the evidence to make a prima facie showing that it is a novel theory which is not generally accepted (Matter of Seventh Jud. Dist. Asbestos Litig., 9 Misc 3d 306, 311-312 [Sup Ct, Wayne County 2005]). The burden then shifts to the proponent of the evidence to show by a fair preponderance of the credible evidence that there is sufficient general acceptance of its reliability (id. at 312).
“[T]he court may, as it did here, take the testimony of expert witnesses” (People v Wesley, 83 NY2d at 437 [Kaye, Ch. J., concurring]). Eugene J. West, a fire and arson consultant in the private sector since 1997, testified on behalf of plaintiff. His experience in the investigation of explosive and incendiary devices began in the Republic of Vietnam where he was an expert in mines and booby traps and the destruction of explosive ordnance *1080 and incendiary devices. When he returned to the United States, Mr. West enrolled in military police school where he received additional training in investigation.
In 1971, Mr. West entered the New York City Police Academy. From 1972 to 1977 he was a correction officer for the New York City Correction Department. From 1977 to 1987 he was a firefighter for the New York City Fire Department and then was promoted to the New York City Bureau of Fire Investigation (the Fire Marshal’s Office) where he attended the Fire Marshal Training Academy. Mr. West conducted field investigations involving the crime of arson for cause and origin of fires.
In 1992, Mr. West attended the FBI National Academy where he took courses in forensics, photography and behavioral science. After graduation, Mr. West was assigned to the citywide investigations unit in the Bureau of Fire Investigation where he was charged with investigating major fire incidents. While there, he started the major incident response team that was specially trained to investigate major fire incidents. At that time Mr. West was also an instructor in the field of fatal fire investigations at the FBI Academy. In 1997 he partnered with the former Assistant Chief Fire Marshal of New York City to form Guardian Investigations Group.
Mr. West testified that in his capacity as a fire investigator he would get many requests to utilize computer fire modeling but would decline to use it as part of the official investigation, stating that “We can only speculate as to what was the composition or the exact construction of a room or the type of materials that were used, especially if those things are no longer available to us” (transcript of Frye hearing [tr] at 16).
Mr. West stated that it was never generally accepted as an investigative tool by the New York City Fire Department. It was his opinion that computer fire modeling is not generally accepted in the fire investigative community and cannot be used to determine the cause of a fire (tr at 20, 21). Although computer fire modeling was used in the World Trade Center investigation, it was used for illustrative purposes (tr at 30). Mr. West explained that there is a caveat by the National Fire Protection Association (NFPA) that the program is essentially as good as the information put into it.
Mr. West’s expert opinion is sufficient, in the court’s opinion, to make a prima facie showing that computer fire modeling, when used to determine the cause of a fire, would be novel for that purpose and is not generally accepted in the fire investiga *1081 tive community (Matter of Seventh Jud. Dist. Asbestos Litig., 9 Misc 3d at 312). The burden now shifts to the proponent of the evidence to establish general acceptance of its reliability (id.).
Jozef Urbas, an associate professor at the University of North Carolina Department of Engineering where he teaches principles of fire behavior or fire dynamics, testified in support of computer fire modeling’s general acceptance. Dr. Urbas uses two textbooks that specifically refer to fire modeling: Principles of Fire Behavior and Fire Dynamics. With regard to his background, Dr. Urbas testified that he has a Ph.D. in chemistry and that part of his studies included fire dynamics in fire modeling.
According to Dr. Urbas, in addition to the University of North Carolina, programs in fire sciences which also incorporate fire dynamics in fire modeling are also offered at the University of Maryland, Worcester Polytechnic Institute, Lund University in Sweden, University of Edinburgh in Scotland and at universities in New Zealand, Australia, Japan and Europe. Dr. Urbas also testified that the following organizations endorse fire modeling in fire dynamics: American Society of Testing and Materials, E05 Committee; Society of Fire Protection Engineers; NFPA; International Association of Fire Safety Science; and International Organization for Standardization, all of which conduct conferences and lectures attended by members of the fire science community and other scientists and engineers. Dr. Urbas has lectured at NFPA and testified that NFPA endorses the use of fire modeling in fire dynamics in the use of fire investigation.
Fire dynamics was described as “the course of a fire from its ignition to its extinguishment. It describes the time line of a fire in terms of ignition, flame spread, release of heat, flame size, temperatures, velocities, toxic gasses and smoke” (tr at 42). Dr. Urbas testified that the underlying equations and laws of physics have been generally accepted in the fire science community (tr at 44) and that they have been generally accepted as reliable in computer fire modeling (tr at 46). Dr. Urbas used the National Institute of Standards and Technology (NIST) Fire Dynamics Simulator (version 4) (FDS), which was marked as defendant’s exhibit C. Dr. Urbas testified that fire modeling of fire dynamics is not a new science (tr at 49-50) and that the NIST FDS is used in the science and engineering community for design purposes (such as buildings and their contents) and for fire re-creation (tr at 60).
Although counsel for defendant stated that there are cases that have allowed fire dynamics to be used in evidence, none *1082 were found with respect to fire modeling that applied the Frye standard. The NIST is part of the Department of Commerce. Dr. Urbas testified that other regulatory agencies of the federal government also use fire modeling, such as the Department of Energy, the Nuclear Regulatory Commission, the Department of Defense, the Department of Agriculture and the Bureau of Alcohol, Tobacco, Firearms and Explosives. The court notes that these regulatory agencies are involved in risk assessment as opposed to fire investigation based on scientific standards.
Counsel for defendant explained that there was a misunderstanding as to the purpose of the computer fire modeling. Dr. Urbas was not coming into court to state the cause and origin of the fire, but rather to apply the computer dynamics to see how the fire would spread (tr at 64). Dr. Urbas testified that the results of the fire modeling established that there was a time line that matched a particular origin of the fire, that the damage in the building corresponded to the results of the modeling and that the determination of fire dynamics in that particular theory (the time line) is generally accepted for that purpose (tr at 69). The computer fire modeling essentially verified the hypothesis as to the ignition source or cause of the fire (tr at 72). Dr. Urbas “never said it’s accepted for determining the origin of the fire ... It can — it can help determining the cause. It’s — it cannot be the sole method of determining the cause” (tr at 80). While computer fire modeling may be generally accepted in the scientific community for predicting the course of fires given a particular set of circumstances and, therefore, useful in fire prevention and safety, Dr. Urbas has not demonstrated its general acceptance in fire investigation.
Dr. Urbas acknowledged that Kirk’s Fire Investigation is a bible in the fire investigation field. Although Dr. Urbas disagreed with a reading from that text on the record, the reading revealed that
“[e]xperienced fire scientists realize the limitation of applying models to field fire investigations. These models in general are designed to start with the ignition of a fire under preset conditions and predict the time factors and conditions of growth and sometimes decay. They are not designed to recreate a particular fire by working backward from a set of final observations to determine what the starting or even intermediate conditions were” (tr at 79).
The User’s Manual for NFPA 921 (at 234 [2d ed 2005]) states: “To conduct valid modeling and testing, it is important that the *1083 investigator gather data that are as accurate and complete as possible.” Dr. Urbas agreed that the concept “garbage-in-garbage-out” was applicable (tr at 73). Here, the input was based upon regulatory agency tables (for furniture, floors, walls, etc.),* measurements taken by Dr. Urbas, his inspection of the damage and his reliance upon information received from fire investigators from the insurance company. Dr. Urbas never spoke with the homeowner, the Nassau County fire officials or local firefighters. Dr. Urbas testified that he was unaware that there were paint thinners and solvents in the area where the fire started and that such knowledge would have thrown off the entire calculation (tr at 75).
Fire modeling carries with it a 15% to 20% margin for error assuming all conditions are correct but could be as high as 80% depending upon the real conditions (tr at 76-77). Dr. Urbas acknowledged that there could be a difference between the material represented in a table and the actual material at the fire scene (tr at 83). “If the input in the model is correct then the output is correct” (tr at 96). Dr. Urbas’ testimony indicated that incorrect input could lead to inaccurate results.
Bearing in mind that the court’s role as gatekeeper is “counting scientists,” the court finds that defendant did not present sufficient evidence to establish that there is a consensus in the fire investigation community that computer fire modeling is generally accepted as reliable. “The long-recognized rule of Frye v United States (supra) is that expert testimony based on scientific principles or procedures is admissible but only after a principle or procedure has ‘gained general acceptance’ in its specified field” (People v Wesley, 83 NY2d at 422). Here the specified field is fire investigation. The issue before the trier of fact in this particular lawsuit involves when and how the fire started. Defendant failed to meet its burden of proving that its expert’s use of computer fire modeling was generally accepted in the fire investigation community (Cumberbatch v Blanchette, 35 AD3d 341, 342 [2d Dept 2006]). Although defendant’s expert may support a case for the acceptance of computer fire modeling in the regulatory/design community, he does not support a conclusion that it is generally accepted in the fire investigation community.

 Dr. Urbas stated that “[t]here might be a difference between the material that is represented in the tables and . . . the actual fire scene.” He determines whether to apply those numbers or not. (Tr at 83.)