[14 NYS3d 338]

For the People Theatres of N.Y., Inc., Doing Business as Fair Theatre, Plaintiff, and JGJ Merchandise Corp., Doing Business as Vishans Video, Also Known as Mixed Emotions, Respondent, v City of New York et al., Appellants.

Ten's Cabaret, Inc., Formerly Known as Stringfellow's of New York, Ltd., et al., Respondents, v City of New York et al., Appellants.

First Department, July 21, 2015

### APPEARANCES OF COUNSEL

*Zachary W. Carter, Corporation Counsel,* New York City (*Elizabeth S. Natrella, Leonard Koerner, Robin Binder* and *Sheryl Neufeld* of counsel), for appellants.

*Fahringer & Dubno,* New York City (*Herald Price Fahringer, Erica T. Dubno* and *Nicole Neckles* of counsel), for JGJ Merchandise Corp., respondent.

*Zane and Rudofsky,* New York City (*Edward S. Rudofsky* of counsel), and *Mehler & Buscemi,* New York City (*Martin P. Mehler* of counsel), for Ten's Cabaret Ltd. and others, respondents.

### OPINION OF THE COURT

KAPNICK, J.

Before this Court is the third consolidated appeal in two matters that were commenced in or about September 2002. These matters, which were previously addressed in *For the People Theatres of N.Y. Inc. v City of New York* (84 AD3d 48 [1st Dept 2011, Acosta, J.]) and *For the People Theatres of N.Y.,*

*Inc. v City of New York* (20 AD3d 1 [1st Dept 2005, Nardelli, J.], *mod* 6 NY3d 63 [2005]), pertain to the constitutionality of certain zoning amendments aimed at curtailing adult businesses.

Factual Background

In 1993, the New York City Department of City Planning (DCP) began a comprehensive assessment of the impact of adult establishments on the quality of urban life. DCP's 1994 "Adult Entertainment Study" (DCP Study) concluded that adult entertainment establishments,[1] particularly when concentrated in a specific area, tend to produce negative secondary effects such as increased crime, decreased property values, reduced commercial activities, and erosion of community character.

In response to the DCP Study, the City adopted an amended zoning resolution in 1995 (1995 Resolution) that barred any "adult establishment" from all residential zones and most commercial and manufacturing districts, mandating that adult businesses, where permitted, had to be at least 500 feet from houses of worship, schools, and day care centers (Text Amendment N950384 ZRY [No. 1322]; Amended Zoning Resolution §§ 32-01 [a]; 42-01 [b]).

The 1995 Resolution defined an "adult establishment" as a commercial establishment in which a "substantial portion" of the establishment includes "an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof" (Amended Zoning Resolution § 12-10 [Adult establishment] [1]). An "adult book store" was defined as having a "substantial portion" of its "stock-in-trade" in, among other things, printed matter or video representations depicting "specified sexual activities" or "specified anatomical areas" (§ 12-10 [Adult establishment] [1] [a]), and an "adult eating or drinking establishment" was defined as

---

1. The DCP set parameters on what qualified as an "adult entertainment establishment" for purposes of the DCP Study. It stated that

> "an adult entertainment establishment is a commercial use that defines itself as such through exterior signs or other advertisements. Thus, a 'triple-X or XXX' video store is an adult entertainment establishment, but a neighborhood video store that devotes a small area to triple-X videos is not. This self-defining characteristic allowed the survey to focus on those establishments for which there is some consensus that the use is adult . . . . The survey was further restricted to three types of such uses: adult video and bookstores, adult live or movie theaters, and topless or nude bars" (DCP Study at 1-2).

an eating or drinking establishment "which regularly features" live performances or movies "characterized by an emphasis on" "specified sexual activities" or "specified anatomical areas," or whose employees regularly expose "specified anatomical areas" to patrons as part of their employment, and which excludes minors (§ 12-10 [Adult establishment] [1] [b]).[2]

In response to claims from owners and operators of adult establishments that the resolution's operative phrase, "substantial portion," was fatally vague, the Department of Buildings and the City Planning Commission determined that the "substantial portion" provision meant that any commercial establishment with "at least 40 percent" of its accessible floor area or stock used for adult purposes qualified as an adult establishment (*see City of New York v Les Hommes*, 94 NY2d 267, 271 [1999]).

After this 60/40 formula became the governing standard, adult businesses sought to alter their character to ensure that they did not qualify as "adult establishments" within the meaning of the City's zoning law by reducing their adult usage to less than 40% of their floor area or stock. Thereafter, the City brought civil proceedings to close establishments that did not comply with the 60/40 standard (*see e.g. City of New York v Desire Video*, 267 AD2d 164 [1st Dept 1999]).

Additionally, in 1998, the City began to bring nuisance proceedings against businesses that it believed were in technical compliance with the 60/40 formula, but were using their nonadult inventory as a "sham." These claims for "sham compliance" were unsuccessful, the Court of Appeals finding that the guidelines must be enforced as written, and that there was nothing in the guidelines to permit considerations such as whether the nonadult stock was stable or unprofitable (*Les Hommes*, 94 NY2d at 273 ["Either the stock is available or ac-

---

**2.** In an action filed by a group of adult establishments, including Stringfellow's, the predecessor in interest of plaintiff Ten's Cabaret, this Court affirmed the motion court's rejection of the plaintiffs' constitutional challenge to the 1995 Resolution (*Stringfellow's of N.Y. v City of New York*, 241 AD2d 360 [1st Dept 1997], *affd* 91 NY2d 382 [1998]). In affirming our order, the Court of Appeals held that the 1995 Resolution was not "purposefully directed at controlling the content of the message conveyed through adult businesses" (91 NY2d at 397) and was "not constitutionally objectionable under any of the standards set forth by the United States Supreme Court in *Renton v Playtime Theaters* . . . or by this Court in *Matter of Town of Islip v Caviglia*" (*id.* at 406). The Court noted that the federal courts had "upheld similar zoning provisions that regulate commercial facilities devoting a 'substantial portion' of their businesses to adult entertainment" (*id.* at 405).

cessible, or it is not; either the appropriate amount of square footage is dedicated to nonadult uses, or it is not."]).

Following these failed efforts, the New York City Council adopted and ratified Text Amendment N010508 ZRY to the 1995 Resolution (the 2001 Amendments) to address the concern that some commercial establishments were subverting the 1995 Resolution by superficially complying with the 60/40 formula but retaining their predominant, ongoing focus on sexually explicit materials or activities.

Specifically, with respect to "adult eating or drinking establishments," the 2001 Amendments removed "substantial portion" from the definition of "adult establishment," providing instead that a venue that "regularly features in any portion of such establishment" live performances characterized by an emphasis on "specified anatomical areas"[3] or "specified sexual activities"[4] and excludes or restricts minors, is covered, regardless of whether it limits those performances to less than 40% of its floor area.

With respect to adult video and book stores, the 2001 Amendments modified the "substantial portion" standard to provide that nonadult material would not be considered stock-in-trade for the purpose of the "substantial portion" analysis where one or more of the following features were present:

> "(aa) An interior configuration and layout which requires customers to pass through an area of the store with 'adult printed or visual material' in order to access an area of the store with 'other printed or visual material';
>
> "(bb) One or more individual enclosures where adult movies or live performances are available for viewing by customers;
>
> "(cc) A method of operation which requires customer transactions with respect to 'other printed or visual material' to be made in an area of the store which includes 'adult printed or visual material';

---

**3.** "[S]pecified anatomical areas" are defined as "(i) less than completely and opaquely concealed: (aa) human genitals, pubic region, (bb) human buttock, anus, or (cc) female breast below a point immediately above the top of the areola; or (ii) human male genitals in a discernibly turgid state, even if completely and opaquely concealed" (§ 12-10 [Adult establishment] [2] [c]).

**4.** "[S]pecified sexual activities" are defined as "(i) human genitals in a state of sexual stimulation or arousal; (ii) actual or simulated acts of human masturbation, sexual intercourse or sodomy; or (iii) fondling or other erotic touching of human genitals, pubic region, buttock, anus or female breast" (§ 12-10 [Adult establishment] [2] [b]).

"(dd) A method of operation under which 'other printed or visual material' is offered for sale only and 'adult printed or visual material' is offered for sale or rental;

"(ee) A greater number of different titles of 'adult printed or visual material' than the number of different titles of 'other printed or visual material';

"(ff) A method of operation which excludes or restricts minors from the store as a whole or from any section of the store with 'other printed or visual material';

"(gg) A sign that advertises the availability of 'adult printed or visual material' which is disproportionate in size relative to a sign that advertises the availability of 'other printed or visual material,' when compared with the proportions of 'adult' and other 'printed or visual materials' offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of 'adult' and 'other printed or visual materials';

"(hh) A window display in which the number of products or area of display of 'adult printed or visual material' is disproportionate in size relative to the number of products or area of display of 'other printed or visual material,' when compared with the proportions of adult and 'other printed or visual materials' offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of 'adult' and 'other printed or visual materials';

"(ii) Other features relating to configuration and layout or method of operation, as set forth in rules adopted by the Commissioner of Buildings, which the Commissioner has determined render the sale or rental of 'adult printed or visual material' a substantial purpose of the business conducted in such store. Such rules shall provide for the scheduled implementation of the terms thereof to commercial establishments in existence as of the date of adoption, as necessary" (§ 12-10 [Adult establishment] [2] [d]).

Procedural History

In September 2002, plaintiffs For the People Theatres, a movie theater that showed adult films, and JGJ Merchandise Corp., an adult video store, brought an action against the City, seeking a judgment declaring the 2001 Amendments to be facially unconstitutional and unenforceable, as well as for injunctive relief. In October 2002, plaintiffs Ten's Cabaret and Pussycat Lounge commenced similar actions, which were later consolidated.

On their initial motion for a preliminary injunction, plaintiffs, all of whom had reconfigured their establishments to comply with the 60/40 allocation, argued that, in seeking to amend the 1995 Resolution, the City failed to review the data, or generate any new empirical data, regarding the purported adverse secondary effects of 60/40 establishments, instead improperly relying on the 1994 DCP Study it had used in support of the original zoning restrictions, and that it modified the 60/40 rule so that compliant establishments would be found to be adult establishments for zoning purposes even though they were very different from the 100% entities reviewed in the DCP Study.

In response, the City cross-moved for summary judgment, arguing that a new study was not necessary because the City Council had rationally found that the 60/40 clubs and video/book stores, as defined in the 2001 Amendments, retained a predominant, ongoing focus on sexually explicit entertainment, notwithstanding their 60/40 configuration, and that the DCP Study had already determined that establishments predominantly focusing on sexually explicit entertainment gave rise to negative secondary effects.

By orders entered September 9, 2003, Supreme Court denied the City's motion for summary judgment, finding that because the 2001 Amendments regulated constitutionally protected expression, the City was required to make an evidentiary showing as to the basis for their adoption, and could not rely on the 1994 DCP report and the studies contained therein, which did not address 60/40 establishments or demonstrate that they would cause secondary effects (*For the People Theatres of N.Y. v City of New York*, 1 Misc 3d 394 [Sup Ct, NY County 2003], *revd* 20 AD3d 1 [1st Dept 2005], *mod* 6 NY3d 63 [2005]; *Ten's Cabaret v City of New York*, 1 Misc 3d 399 [Sup Ct, NY County 2003], *revd* 20 AD3d 1 [1st Dept 2005], *mod* 6 NY3d 63 [2005]).

The two matters were consolidated for appeal to this Court, which reversed Supreme Court's rulings (20 AD3d 1). This

Court rejected plaintiffs' attempt to "revisit their previous ill-fated argument that there is insufficient evidence to establish a correlation between adult business and adverse secondary effects" (*id.* at 16-17), and found that no new "secondary impacts" study was required absent a showing that the essential nature of the 60/40 businesses had changed (*id.* at 18).

The Court of Appeals, following the United States Supreme Court in *Los Angeles v Alameda Books, Inc.* (535 US 425 [2002]), concluded that the City "was not required . . . to relitigate the secondary effects of adult uses, or to produce empirical studies connecting 60/40 businesses to adverse secondary effects" (6 NY3d at 83), but nevertheless found that the City had presented evidence raising a triable issue of fact as to the nature of the adult businesses, and remanded to Supreme Court for further proceedings.[5]

On remittitur, the *For the People* and *Ten's* cases were tried separately. At the trials, the City presented evidence regarding the primary adult focus of more than 20 60/40 bookstores and 10 60/40 clubs.[6]

By order entered April 8, 2010, the trial court upheld the constitutionality of the 2001 Amendments' definitions of "adult establishment" insofar as they concerned "adult bookstores" and "eating and drinking establishments," finding that the City had shown, by substantial evidence, that the "dominant, ongoing focus" of those businesses was on "adult matters" (27 Misc 3d 1079, 1089 [Sup Ct, NY County 2010], *revd* 84 AD3d 48 [1st Dept 2011]).[7]

Plaintiffs appealed, and this Court reversed, vacating the finding of constitutionality and remanding the matter for further proceedings (84 AD3d at 48). With respect to the *Ten's* plaintiffs' as-applied challenge to the 2001 Amendments, this Court found that "while the 2001 Amendments might be

---

5. In a dissent joined by two of her colleagues, then Chief Judge Judith S. Kaye argued that the 2001 Amendments constituted a "new law" and that plaintiffs had produced substantial evidence as to the lack of any correlation between the 60/40 operations and negative secondary effects (6 NY3d at 85-87).

6. The 10 60/40 clubs are Bare Elegance, Lace, Private Eyes, Lace II, VIP Club, Pussycat Lounge, Ten's Cabaret, HQ, Vixen, and Wiggles.

7. With respect to adult movie theaters, the court held that the City failed to establish that theaters, which limit regularly featured adult entertainment to less than 40% of their customer accessible floor area, have a predominant ongoing focus on adult entertainment. The City did not appeal the rulings concerning movie theaters, and it is not at issue here.

constitutional in most situations, there may be instances where the application of the ordinance might be an unconstitutional abridgment of First Amendment protections," and directed the trial court to set forth its findings of fact as to such a challenge (84 AD3d at 65).

Following the remand, the parties submitted proposed findings of fact, as well as legal memoranda. Rather than submit additional evidence, the City argued that the evidence already in the record showed that all 60/40 establishments continued to have a predominant sexual focus.

By order entered August 30, 2012, Supreme Court held that the 2001 Amendments were facially unconstitutional, and permanently enjoined the City from enforcing them (38 Misc 3d 663 [2012]). As such, the trial court never reached the as-applied challenge. The City now appeals.

Discussion

"A regulation that infringes upon constitutionally protected speech or conduct . . . must be justified by unrelated concerns, and no broader than necessary to achieve its purpose" (6 NY3d at 85 [Kaye, Ch. J., dissenting], citing *Matter of Town of Islip v Caviglia*, 73 NY2d 544, 557-560 [1989]). This standard, otherwise known as "intermediate scrutiny," was applied by the Court of Appeals in resolving the constitutional challenge to the 1995 Resolution in *Stringfellow's* (91 NY2d 382). However, in the challenge to the 2001 Amendments, the Court of Appeals held that the City did not need to meet intermediate scrutiny, because the 2001 Amendments were merely a clarification or extension of the 1995 Resolution. Therefore, the Court held that the City met its initial burden of showing that the 2001 Amendments were justified "as a measure to eradicate the potential for sham compliance with the 1995 Ordinance, and thus to reduce negative secondary effects to the extent originally envisaged" (6 NY3d at 83). In so holding, the Court accepted the City's argument that the 2001 Amendments were intended to combat the same negative secondary impacts that the 1995 Resolution was meant, but failed, to combat. The Court also found that because the plaintiffs met their burden to " 'furnish[ ] evidence that disput[ed] the [City's] factual findings,' the burden shifted back to the City 'to supplement the record with evidence renewing support for a theory that justifie[d] [the 2001 Amendments]' " (6 NY3d at 83, quoting *Alameda*, 535 US at 439).

It is clear that this final burden was meant to require the City to present evidence that supported its theory that because

the 60/40 entities' nonadult uses were a sham, the businesses continued to be predominantly sexually focused, and, therefore, a new study showing negative secondary effects of the 60/40 entities was not legally required. To this end, the Court of Appeals held that

> "a triable question of fact has been presented as to whether 60/40 businesses are so transformed in character that they no longer resemble the kinds of adult uses found, both in the 1994 DCP Study and in studies and court decisions around the country, to create negative secondary effects—as plaintiffs contend—or whether these businesses' technical compliance with the 60/40 formula is merely a sham—as the City contends.

> "In addressing this factual dispute, we anticipate that the City will produce evidence *relating to the purportedly sham character* of self-identified 60/40 book and video stores, theaters and eating and drinking establishments or other commercial establishments located in the city. This does not mean that the City has to perform a formal study or a statistical analysis, or to establish that it has looked at a representative sample of 60/40 businesses in the city. If the trier of fact determines, after review of this evidence, that the City has fairly supported its position on sham compliance—i.e., despite formal compliance with the 60/40 formula, these businesses display a predominant, ongoing focus on sexually explicit materials or activities, and thus their essential nature has not changed—the City will have satisfied its burden to justify strengthening the 1995 Ordinance by enacting the 2001 Amendments, and will be entitled to judgment in its favor. If not, plaintiffs will prevail on their claim that the 2001 Amendments are insufficiently narrow and therefore violate their free speech rights. In that event, plaintiffs will be entitled to judgment and a declaration that the 2001 Amendments are unconstitutional" (6 NY3d at 83-84 [emphasis added]).

This Court's order remanding the cases again after the trials were held on remittitur from the Court of Appeals further clarified the issue (84 AD3d 48). We noted that the City had to "es-

tablish that the essential characteristics or features of the 60/40 uses are very similar to those adult uses that were previously found to cause secondary effects" (84 AD3d at 59), and that the trial court had to "compare 'self-identified' 60/40 businesses with the adult businesses discussed in the DCP study, other studies and case law so as to determine whether the 60/40 businesses retained a predominant focus on sexually explicit materials" (84 AD3d at 60-61) or were " 'so transformed in character that they no longer resemble the kinds of adult uses found, both in the 1994 DCP Study and in studies and court decisions around the country, to create negative secondary effects' " (*id.* at 55, quoting 6 NY3d at 84).

While acknowledging that the DCP Study primarily addressed "the consequences of *significant concentrations* of adult businesses emphasizing sexually explicit materials and not the particular attributes that caused secondary effects" (84 AD3d at 61 [emphasis added]), this Court drew upon some of the attributes highlighted by the DCP Study to develop criteria for the trial court to rely upon in its analysis. These criteria are: (1) "the presence of large signs advertising adult content," (2) "significant emphasis on the promotion of materials exhibiting 'specified sexual activities' or 'specified anatomical areas,' as evidenced by a large quantity of peep booths featuring adult films," (3) "the exclusion of minors from the premises on the basis of age," and (4) "difficulties in accessing nonadult materials" (84 AD3d at 61-62). We instructed that if the trial court found that most, if not all, 60/40 establishments featured any or all of the first three of these attributes, the City would have met its burden of proof (*id.* at 62 n 12).

While the City's evidentiary burden was light (*see* 6 NY3d at 80), contrary to the position taken by the dissent, this standard relates specifically to proving, at the outset of the process, the existence of a correlation between the adult establishments and negative secondary effects; as previously discussed, that issue has already been resolved by the Court of Appeals, and thus is not before us. The "very little evidence" standard (6 NY3d at 80 [internal quotation marks and emphasis omitted]) is not the standard applicable to the City at the trial level, which is what we are reviewing here (*see Alameda*, 535 US at 451 [Kennedy J., concurring]).

Adult Bookstores and Video Stores

The City argues that the trial court erred in striking down the 2001 Amendments with respect to the definition of adult

video and book stores. It further argues that despite any changes allowing for formal compliance with the 60/40 rule, the identified establishments clearly retain a predominant, ongoing sexual focus. The City relies on evidence showing the exclusion of minors, the promotion and presence of peep booths featuring on-premises viewing of adult material, and the sexually explicit merchandise displayed in the stores. Based on these characteristics, the City contends that these stores resemble the earlier 100% establishments found to cause negative secondary effects and that the court's conclusion otherwise is not supported by a fair interpretation of the record.

Plaintiffs argue that the trial court correctly found in their favor, because the 60/40 businesses no longer resemble their exclusively adult predecessors and do not have a predominant, ongoing focus on adult materials. Plaintiffs urge that nonadult material is readily accessible, signage has been modified to be less graphic, and the presence of peep booths, which are often in the back of the stores, does not create a predominant sexual focus.

First, with respect to the presence of large signs advertising adult content, upon which the DCP study placed special emphasis (*see* 84 AD3d at 61), the evidence shows that eight of the stores have signs visible from the outside announcing the presence of peep booths or adult materials and that all 12 stores that have peep booths promote them through exterior and/or interior signage. The evidence, however, also shows that most of the signage is not graphic (i.e., none of the stores have "XXX" on the outside of the premises), and there is no evidence that any of the stores have adult signs that are larger than those of nearby nonadult businesses, or even that the signs advertising adult content are large. Further, the evidence shows that the signs, at least at Show World, Exquisite DVD, Blue Door Brooklyn, Video Excitement, Thunder Lingerie, and Amsterdam Video, have been significantly modified, and signs advertising nonadult stock have been added so as to limit, if not eliminate, any emphasis on adult material. As the trial court, which had the opportunity to visit at least some of the establishments at issue here, observed, "There are almost no garish neon lighted signs, no hard-core sexual images or language on them and the nonadult signage is as prominent as the adult signage, certainly a significant change from the 1994 situation" (38 Misc 3d at 675). Given the foregoing, this Court finds that the signage evidence is not indicative of a predominant sexual focus in most of the stores.

Next, we look at whether there is a significant emphasis on the promotion of materials that exhibit "specified sexual activities" or "specified anatomical areas." It is undisputed that all 13 stores sell such materials, which indicates that the stores are of an "adult nature." It is also clear that although these stores may have reduced their stock of such materials to below the 40% threshold, the materials remain a significant part of the business, and the stores all place a significant emphasis on the promotion of such materials, based on promotional signage, window and interior displays and layouts promoting sexually focused adult materials and activities. With respect to peep booths, the record evidence establishes that 12 of the 13 stores have peep booths for viewing adult films, with seven of the stores having "buddy-booths." In terms of quantity, the evidence shows that the 12 stores have anywhere from 7 to 60 booths on premises, with an average of about 17 booths. This evidence supports the City's argument that the stores are predominantly sexually focused; however, promotion of sexually explicit materials is only one of the four relevant factors.

With respect to the exclusion of minors, the evidence shows that only six of the 13 stores exclude minors entirely, and at least one other store restricts minors from entering its adult area. There is limited evidence as to the reasoning behind these exclusions; however, at least one of plaintiffs' witnesses testified that minors are excluded because they tend to come in groups and disrupt the store. This evidence is not indicative of a predominant sexual focus in most of the stores, since nearly half of the stores do not restrict the admittance of minors at all.

Finally, as to whether the layout of the store makes it difficult to access nonadult materials, there is nothing in the record to suggest that such a difficulty exists at any of the stores. In fact, there is ample evidence that most of the stores keep the nonadult materials in the front of the stores, making them easy to access (38 Misc 3d at 670-672).[8]

According due deference to the factual findings of the trial court, this Court finds that three of the four factors tend not to support the City's position, and therefore that the City has not met its burden with respect to the adult video and book stores.

8. While the dissent takes issue with our "mechanical and mathematical approach" to weighing the enumerated factors, in fact, what we have attempted to do is separately and fully analyze each of the characteristics that this Court suggested should be considered in making this determination (84 AD3d at 61-62).

Adult Eating and Drinking Establishments

The City argues that it met its burden of showing that, despite the changes that the identified 60/40 establishments made to conform to the 60/40 rule, the establishments retain a predominant, ongoing focus on sexually explicit activities.

The City further argues that the essential nature of the 60/40 clubs has not changed, because they display a predominant, ongoing focus on sexually explicit activities and specified anatomical areas by virtue of the fact that all of the clubs "regularly feature[ ]" topless dancing. The evidence shows that topless dancing takes place at all times daily for approximately 16 to18 hours a day and that lap dances are provided in both public and private areas of the club. The City contends that this focus on sexually explicit activities and specified anatomical areas is not mitigated by the clubs' nonadult sections where the nonadult use is a restaurant or bar that serves adult-section customers or even where it is independent of the adult business but takes place in a separate part of the premises. Accordingly, the City contends that only three of the clubs offer any independent nonadult use that reduces the predominant, ongoing focus on sexually explicit activities and specified anatomical areas.

Plaintiffs respond that the City cannot prevail merely by showing that the clubs feature topless entertainment on a regular basis. They argue that the changes made to the clubs by reducing the floor space devoted to such entertainment removed the predominant sexual focus linked to the adverse secondary effects found to be caused by the 100% entities. Plaintiffs point out that the nonadult sections either are used to add amenities to the establishment, such as restaurants, pool tables or sports lounges, or operate as live entertainment venues where bands perform.

The evidence adduced by the City makes it clear that the 60/40 clubs regularly feature topless dancing and lap dancing in a substantial portion of their overall space. This, coupled with the evidence regarding some of the clubs' website and newspaper advertisements, certainly goes to the second factor, promotion of sexually explicit materials, and demonstrates an emphasis on the promotion of materials that exhibit "specified sexual activities" or "specified anatomical areas," which

indicates a predominant sexual focus in most of the clubs.[9] However, there was little to no evidence presented as to the other factors,[10] such as the nature of the outward signage (first factor) and the difficulty in accessing the nonadult material, or, in this case, the nonadult section of the club (fourth factor). There was also no evidence presented as to the nature of the pre-1994 or 100% clubs.[11]

The little evidence we do have as to the clubs' signage shows that some clubs refer to themselves as "gentlemen's clubs" or advertise "adult entertainment," "live beautiful models" or "sports cabaret" on their outside awnings. There is no evidence as to the size of these signs or how they compare to signs advertising nonadult activity or those of surrounding nonadult businesses. This is not enough to show that the signage indicates a predominant sexual focus in most of the clubs.

With regard to layout or difficulty in accessing the nonadult section, the City concedes that some of the clubs have layouts different from those in the 100% clubs, although there is also evidence that some of the clubs have the adult sections on the ground floor and the nonadult sections on the second floor, while other clubs have the nonadult sections operating next door to the adult sections. There is, however, no evidence in the record that these configurations make the nonadult sections difficult to access.

As with the book stores and video stores, satisfaction of one of the factors is not sufficient to meet the City's burden. The City assumes that because the 60/40 clubs regularly feature topless dancing, this automatically means that they retain a predominant sexual focus. However, there is nothing in the prior related decisions that mandates that conclusion. Thus, this Court finds that the City has not met its burden with respect to the adult eating and drinking establishments.

---

**9.** Essentially, the regularity of sexually explicit dancing and the promotion thereof is the equivalent of a large quantity of peep booths in the video/book store setting.

**10.** While the City suggests that this Court's factors only apply to adult book and video stores, there is no such express limitation in our decision and no reason why the factors cannot be applied to both types of establishments. Moreover, the City had an opportunity to submit more evidence to the trial court after this Court's decision was issued announcing the factors, and it chose not to.

**11.** The third factor, which asks whether minors are excluded by age, is moot here, since minors are presumably excluded because alcohol is served at the premises, not because of a focus on adult material.

Accordingly, the judgment of the Supreme Court, New York County (Louis B. York, J.), entered October 10, 2012, declaring the 2001 Amendments to New York City's adult use zoning regulation as to adult eating and drinking establishments and adult video and book stores an unconstitutional violation of the First Amendment and permanently enjoining the City from enforcing the amendments, should be affirmed, without costs.

ANDRIAS J. (dissenting). In this protracted litigation, we once again consider the constitutionality of the City's adult use zoning regulations, as amended in 2001.

When the matter was last before this Court, we vacated the trial court's finding, after separate trials, that the 2001 Amendments were constitutional on the ground that the court "did not elaborate on the criteria [underlying its determination]" and "failed to state the particular facts on which it based its judgment" (84 AD3d 48, 59 [1st Dept 2011], *revg* 27 Misc 3d 1079 [Sup Ct, NY County 2010]). Accordingly, we remitted the matter to the court for a decision setting forth its findings as to plaintiffs' facial and "as applied" constitutional challenges, directing the court to reassess the evidence under the "somewhat heightened" standard of review of "intermediate scrutiny" (*id.* at 63).

Simply put, we framed the issue as whether the "self-identified 60/40 businesses" under review displayed a predominant, ongoing focus on sexually explicit materials or activities (*id.* at 60 [internal quotation marks omitted]), or whether there had been a significant change in their character that distinguished them from their pre-1995 forbears (*id.* at 63). We also instructed the trial court not to consider evidence that was irrelevant to this issue (*id.*).

On remand, the trial court found that "[g]iven their current arrangements and secondary characteristics, [the adult establishments] no longer operate in an atmosphere placing more dominance of sexual matters over nonsexual ones" (38 Misc 3d 663, 675 [Sup Ct, NY County 2012]). Consequently, the court declared the 2001 Amendments unconstitutional as violative of the free speech provisions of the U.S. and New York State Constitutions and found it unnecessary to reach the "as applied" challenges (*id.*). Giving "due deference" to the findings of the trial court, the majority affirms, holding that the City did not meet its burden of showing that the 60/40 adult establishments under consideration retain a predominant, ongoing focus on sexually explicit activities, thereby resembling their 100% adult predecessors. I disagree.

"The scope of our review of a nonjury trial is as broad as that of the trial judge, and permits us to substitute our own judgment where the evidence fails to support an important element of the trial court's findings" (*Palmer v WSC Riverside Dr., LLC*, 61 AD3d 589, 589 [1st Dept 2009] [citations omitted]). Although all litigation must come to an end at some point, it is essential that we carefully balance the City's right to exercise its police power in the public interest against the 2001 Amendments' potential infringement on protected speech. Accordingly, because I believe that the trial court failed to undertake an adequate analysis of the relevant factors delineated by the Court of Appeals (6 NY3d 63 [2005]) and this Court (84 AD3d 48), and allowed its improper reconsideration of "negative secondary effects" to permeate its decision, and that the City has sustained its burden as to sham compliance by demonstrating that by and large the essential character of the 60/40 businesses has not changed, even if their physical structure has, I respectfully dissent.

Before 1995, city zoning regulations did not distinguish between adult enterprises and other commercial businesses. This changed after a September 18, 1994 study by the Department of City Planning (DCP) found that adult businesses, which had been rapidly increasing, often had negative secondary impacts such as increased crime rates, decreased property values, and deteriorated community character, and recommended that they be regulated more closely than other commercial uses.

The DCP study led to the 1995 amendments to the City's zoning regulations, which restricted the location of "adult establishments." This included, inter alia, barring adult establishments from residential districts and from manufacturing and commercial districts that also permitted residential development, and requiring that they be located at least 500 feet from churches, schools, day care centers, and other adult uses (*see* Text Amendment N 950384 ZRY [No. 1322]; Amended Zoning Resolution §§ 32-01 [a]; 42-01 [b]).

"Adult establishment" was defined in the 1995 Amendments as "a commercial establishment where a 'substantial portion' of the establishment includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof" (Amended Zoning Resolution § 12-10).

An adult book store was defined as a book store that has a "substantial portion" of its stock-in-trade in books, magazines,

photographs, films, video cassettes, or other printed matter or visual representations that are "characterized by an emphasis upon the depiction or description of 'specified sexual activities' or 'specified anatomical areas' " (*id.* § 12-10 [Adult establishment] [1] [a]). An adult eating or drinking establishment was defined as an eating or drinking establishment that "regularly features" either live performances that are "characterized by an emphasis on 'specified anatomical areas' or 'specified sexual activities' "; films or other photographic reproductions that are "characterized by an emphasis upon the depiction or description of 'specified sexual activities' or 'specified anatomical areas' "; or "employees who, as part of their employment, regularly expose to patrons 'specified anatomical areas' "; and "which is not customarily open to the general public during such features because it excludes or restricts minors by reason of age" (*id.* § 12-10 [Adult establishment] [1] [b]). An adult theater was defined as a theater that "regularly features" films or other similar photographic reproductions that are "characterized by an emphasis on the depiction or description of 'specified sexual activities' or 'specified anatomical areas' " or live performances that are "characterized by an emphasis on 'specified anatomical areas' or 'specified sexual activities,' " and "which is not customarily open to the general public during such features because it excludes minors by reason of age" (*id.* § 12-10 [Adult establishment] [1] [c]).

In *Stringfellow's of N.Y. v City of New York* (91 NY2d 382 [1998]), the Court of Appeals held that the 1995 amended zoning resolution did not on its face violate adult establishments' constitutional rights of free expression. The Court found that the 1995 resolution "was not an impermissible attempt to regulate the content of expression but rather was aimed at the negative secondary effects caused by adult uses, a legitimate governmental purpose" (91 NY2d at 399).

The 1995 resolution did not define "substantial portion," but provided that

> "[f]or the purpose of determining whether a 'substantial portion' of an establishment includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or combination thereof, the following factors shall be considered: (1) the amount of *floor area* and *cellar* space accessible to customers and allocated to such *uses*; and (2) the amount of

*floor area* and *cellar* space accessible to customers and allocated to such uses as compared to the total *floor area* and *cellar* space accessible to customers in the establishment" (Amended Zoning Resolution § 12-10 [Adult establishment] [2] [c]).

The resolution also provided that

"[f]or the purpose of determining . . . whether a book store has a 'substantial portion' of its stock in adult materials . . . , the following factors shall be considered: (1) the amount of such stock accessible to customers as compared to the total stock accessible to customers in the establishment; and (2) the amount of *floor area* and *cellar* space accessible to customers containing such stock; and (3) the amount of *floor area* and *cellar* space accessible to customers containing such stock as compared to the total amount of *floor area* and *cellar* space accessible to customers in the establishment" (*id.* § 12-10 [Adult establishment] [2] [d]).

To clarify the meaning of the phrase "substantial portion," the Department of Buildings issued Operations Policy and Procedure Notice No. 6/98, which provided that a business would qualify as an adult establishment if "at least 40 percent of the floor and cellar area that is accessible to customers [is] available for adult" materials or if "10,000 or more square feet . . . is occupied by an adult use" (*see City of New York v Les Hommes*, 94 NY2d 267, 271 [1999] [internal quotation marks omitted]). Following this edict, adult businesses began to reconfigure their space so as to comply with the 60/40 formula.

In March 2001, after the City unsuccessfully challenged sham compliance by certain adult establishments on the basis of the Nuisance Abatement Law (*see Les Hommes*, 94 NY2d 267), DCP filed an application with the City Planning Commission (CPC) to amend the 1995 zoning resolution. In August 2001, the CPC issued a report endorsing the proposed amendments, as modified after public hearings. The report stated that the amendments were intended "to clarify certain definitions in the [1995 resolution], in order to effectuate the [CPC]'s original intent" (*For the People Theatres*, 6 NY3d at 74 [internal quotation marks omitted]), i.e., by addressing the attempts by adult establishments to stay in business at their present locations through sham conversions that technically complied with the 60/40 formula but did not alter their character.

The City Council adopted and ratified the 2001 Amendments (Text Amendment N 010508 ZRY), which removed "substantial portion" from the definition of an adult establishment and defined adult establishment as "a commercial establishment which is or includes an adult book store, adult eating or drinking establishment . . . or any combination thereof" (Amended Zoning Resolution § 12-10 [Adult establishment] [1]). "Substantial portion" was not removed from the definition of adult video and book stores, but nonadult material was not to be considered stock for substantial portion analysis if: (1) customers had to pass through adult material to reach the nonadult section; (2) any material exposed one to adult material; (3) nonadult material was only for sale, while adult material was for sale or rent; (4) more adult printed materials were available than nonadult ones; (5) minors were restricted from the entire store or from any section offering nonadult material; (6) signs or window displays of adult material were disproportionate to signs and window displays featuring nonadult material; (7) booths were available for viewing adult movies or live performances; or (8) purchasing nonadult material exposed the buyer to adult material (*id.* § 12-10 [Adult establishment] [2] [d]).

In response, plaintiffs commenced these actions seeking a declaration that the 2001 Amendments are unconstitutional.

In determining whether the 2001 Amendments are constitutional, the appropriate starting point is to identify the dispositive issues and the City's burden of proof.

In 2003, the trial court granted plaintiffs summary judgment holding that the 2001 Amendments were unconstitutional (*For the People Theatres of N.Y. v City of New York*, 1 Misc 3d 394 [Sup Ct, NY County 2003], *revd* 20 AD3d 1 [1st Dept 2005], *mod* 6 NY3d 63 [2005]; *Ten's Cabaret v City of New York*, 1 Misc 3d 399 [Sup Ct, NY County 2003], *revd* 20 AD3d 1 [1st Dept 2005], *mod* 6 NY3d 63 [2005]). In 2005, we reversed and declared the 2001 Amendments constitutional (20 AD3d 1). Following the analysis set forth in *Los Angeles v Alameda Books, Inc.* (535 US 425 [2002]), the Court of Appeals modified our reversal and remanded for trial (6 NY3d 63), framing the sole issue thus:

> "whether 60/40 businesses *are so transformed in character that they no longer resemble the kinds of adult uses found, both in the 1994 DCP Study and in studies and court decisions around the country,*

*to create negative secondary effects*—as plaintiffs contend—or whether these businesses' technical compliance with the 60/40 formula is merely a sham—as the City contends" (6 NY3d at 84 [emphasis added]).

The Court of Appeals rejected plaintiffs' argument that a new study was required, holding that if the character of the businesses is not "so transformed," the negative secondary effects are presumed. The Court explained that "[i]t is th[e] essential character—as adult bookstores or adult video stores or strip clubs or topless clubs—that creates negative secondary effects" (6 NY3d at 81), and thus the City "was not required . . . to relitigate the secondary effects of adult uses, or to produce empirical studies connecting 60/40 businesses to adverse secondary effects" (*id.* at 83).

The Court of Appeals also delineated the City's burden of proof, stating:

"In addressing this factual dispute, we anticipate that the City will produce evidence relating to the purportedly sham character of self-identified 60/40 book and video stores, theaters and eating and drinking establishments or other commercial establishments located in the city. This does not mean that the City has to perform a formal study or a statistical analysis, or to establish that it has looked at a representative sample of 60/40 businesses in the city. If the trier of fact determines, after review of this evidence, that the City has *fairly supported its position on sham compliance—i.e., despite formal compliance with the 60/40 formula, these businesses display a predominant, ongoing focus on sexually explicit materials or activities, and thus their essential nature has not changed— the City will have satisfied its burden to justify strengthening the 1995 Ordinance by enacting the 2001 Amendments, and will be entitled to judgment in its favor.* If not, plaintiffs will prevail on their claim that the 2001 Amendments are insufficiently narrow and therefore violate their free speech rights. In that event, plaintiffs will be entitled to judgment and a declaration that the 2001 Amendments are unconstitutional" (*id.* at 84 [emphasis added]).

On the first remand, the trial court, after separate trials without a jury, held that the 2001 Amendments were constitutional (27 Misc 3d 1079 [Sup Ct, NY County 2010], *revd* 84 AD3d 48 [1st Dept 2011]).[1] When this Court reversed that determination, we identified four factors, derived from the 1994 DCP study, that should be considered in determining whether the adult establishments retained a predominant sexual focus. These were: (1) the presence of large signs advertising adult material; (2) the exclusion of minors by reason of age; (3) the sale of materials emphasizing "specified sexual activities" or "specified anatomical areas"; and (4) layouts that made it difficult to access nonadult materials (84 AD3d at 61-62). Furthermore, in addressing the extent of the City's burden under the heightened standard of intermediate scrutiny, we quoted the Court of Appeal's statement that

> "[n]otwithstanding the simplified nature of proof required of municipalities by the United States Supreme Court and the Court of Appeals, '[i]mposing a level of intermediate scrutiny . . . requires more conviction of the connection between legislative ends and means than does the rational basis standard, but only in the sense of 'evidence . . . [that] is reasonably believed to be relevant' to the secondary effects in question' (*For the People*, 6 NY3d at 81 [citations omitted])" (84 AD3d at 63).

Accordingly, in addressing the City's burden, we expressly directed the trial court, on remittitur, to assess the City's proffered evidence as to its claim that 60/40 businesses continued to display a predominant, ongoing focus on sexually explicit materials or activities, and any other evidence offered in support of that claim, keeping in mind that *"'very little evidence is required' to uphold the constitutionality of the 2001 Amendments"* (84 AD3d at 62 [emphasis added], quoting *Alameda Books*, 535 US at 451). However, we did not obligate the City to submit additional evidence on remand. We simply gave it the opportunity to do so.

Applying these standards, on the second remand, the City, without submitting new evidence, demonstrated that the "es-

---

**1.** The court, however, stated that it was "not convinced that the same holding applies to the two adult movie theaters in this action," finding that "[t]he admittedly large number of peep shows in one theatre and the payment of one admission in both theatres which allows a patron to see all of the movies, both adult and nonadult, do not rise even to the low level of substantial evidence" (27 Misc 3d at 1089).

sential nature" of the 60/40 businesses has not changed. Substantial evidence demonstrates that, notwithstanding the present availability of additional amenities or certain nonadult uses of their space, the adult eating and drinking establishments used for illustrative purposes retained a predominant sexual focus. These establishments typically feature topless dancing by multiple dancers on a daily basis for approximately 16 to 18 hours a day (often from noon until 4:00 a.m.) and in a significant portion of the overall space, with lap dancing provided in both the adult and the nonadult areas. The clubs promote the topless dancing and lap dancing, through longer hours, higher prices, more patrons, and sexually focused advertisements.

At least three of the clubs used the same amount of space for topless dancing as they did before the 60/40 rule, and seven used their nonadult areas either to provide additional amenities for their topless bar customers, such as a coat check, an additional bar or dining area or hallways to the bathrooms, or as additional seating area. Only three offered any viable independent nonadult use. Thus, the nonadult portions of most clubs were either essentially a sham or pretext use because the space either was empty or was used to support the adult sexual focus.

In addition to understating the evidence demonstrating that the features of these establishments essentially remained the same, the trial court—contrary to the directions of this Court and the Court of Appeals—also considered whether there was evidence that these establishments caused negative secondary effects (see 84 AD3d at 59, 63 n 15; 6 NY3d at 83). As a result, it placed undue emphasis on the opinions of plaintiffs' experts, who expounded on that issue. This improper consideration permeated the court's conclusion that the establishments did not have a predominant sexual focus.[2]

The adult book stores and video stores also retained a predominant focus on sexual materials or activities. The evidence of promotion, based on signage, displays in some front windows and throughout the stores, and layout, combined with

2. Indeed, in a section captioned "Dicta," the court made clear its view that the 1994 study should not be applied to determine the actual negative secondary effects of the adult establishments today, and that "[w]ithout an actual study, the 2001 legislation should have been struck down, as urged by the three-judge Court of Appeals' minority opinion in For the People (at 6 NY3d 88)" (38 Misc 3d at 676).

the evidence of the presence of large numbers of peep booths and the evidence of the sale of adult sex toys in the nonadult sections of the stores, demonstrates that most of the stores (at least 11 of the 13) emphasized the promotion of sexual materials over nonadult materials.

The majority holds otherwise.

As to adult eating and drinking establishments, the majority concedes that the evidence adduced makes clear that the 60/40 clubs regularly feature topless dancing and lap dancing in a substantial portion of their overall space, and that coupled with evidence from the clubs' websites and ads, this demonstrates a predominant sexual focus. However, stating that this is only one of three relevant factors, the majority finds the amendments unconstitutional because the other two factors, signage and layout, do not tend to support the City's position.

As to the book stores and video stores, the majority similarly concedes that all stores sell materials that promote "specified sexual activities" or "specified anatomical areas," and that while stock may have been reduced to less than 40% of floor space, all stores place a significant emphasis on these materials through signage and layouts promoting them, with stores having an average of 17 peep booths. While acknowledging that this supports the City's argument that the stores are predominantly sexually focused, the majority finds the amendments unconstitutional because this is only one of four relevant factors, and the other three, signage, policy towards minors, and layouts, do not tend not to support the City's position.

The majority's mechanical and mathematical approach, under which the predominant sexual focus in the 60/40 businesses' activities is quantitatively outweighed by signage, policies towards minors, and layouts, is inadequate under the dictates of the Court of Appeals and this Court, and elevates the City's burden of proof. In identifying certain factors relevant in assessing the character of the adult establishments, this Court did not call for a mechanical application by which each factor is to be weighted equally and tallied to arrive at a quantitative conclusion. Rather, in terms of how to weigh the relevant factors, by way of example, this Court explained that a finding

> "that most, though not necessarily all, 60/40 establishments (1) exclude minors, (2) have large signs advertising sexually explicit adult materials

*and / or* (3) emphasize the promotion of materials exhibiting 'specified sexual activities' or 'specified anatomical areas' over nonadult materials will be *more than enough* evidence to justify the City's 2001 ordinances on the basis of the DCP Study" (84 AD3d at 62 n 12 [emphasis added]).

Thus, we recognized that if any one of the factors established that the 60/40 businesses displayed a predominant, ongoing focus on sexually explicit materials or activities, and that there had not been a significant change in their character, it could provide a sufficient basis to hold the 2001 Amendments constitutional.

Contrary to the view of the majority, the record fairly supports the City's contention that the adult establishments reviewed emphasized sexual activities or materials over nonadult materials.

For example, as to the adult eating and drinking establishments, as the trial court found, Ten's Cabaret regularly staged topless dancing and required a cover charge allowing its patrons to go back and forth between the adult and nonadult sections. The Vixen website emphasized adult entertainment, providing photos of the dancers and describing the theme of the club as fantasy and pleasure. The VIP Club offered lap dances to customers in the adult portion and in private rooms in both the first-floor adult portion of the premises and on the second floor in the nonadult portion. Its website offered photographs of the entertainers. Lace's exterior sign and website advertised it as regularly featuring adult entertainment. Private Eyes's awnings advertised "Adult Entertainment" and "Sports Cabaret and Gentlemen's Club." In HQ, topless dancing was performed on the ground floor on two stages accommodating tables and chairs and an eating area. Wiggles had topless dancing on its stage and featured lap dances in its various rooms, charging between $20 and $200 depending on which rooms they took place in. Bare Elegance's exterior sign stated, "Bare Elegance Gentlemen's Club and Lounge" and "Live Beautiful Models." The nonadult area contained a bikini bar and an open area with several couches. Lace II, Pussycat and Vixen used the same amount of space for topless dancing as they did before the 60/40 requirement took effect in 1998.

While the clubs may have added certain amenities, they still resembled their 100% predecessors. Indeed, even as to the prior 100% businesses, the DCP study states:

"Several factors appear to have influenced the recent proliferation of upscale topless clubs in New York. First, responding to the devastating effects of the recession on eating and drinking businesses, some entrepreneurs have retooled their establishments and used topless performances as a successful marketing device to win back their affluent male clientele. Second, the clubs have shed their 'sleazy' reputations and become more mainstream by providing topless entertainment in safe, 'elegant' surroundings furnished with other attractions such as giant closed circuit television screens, pool tables, and air hockey" (1994 DCP Adult Entertainment Study at 17).

Thus, "it is not unreasonable to conclude that an establishment with more than one principal use—for instance, semi-nude dancing and food service—is as liable to produce negative externalities as an establishment wholly devoted to presenting semi-nude dancing" (*Entertainment Prods., Inc. v Shelby County, Tenn.*, 588 F3d 372, 382 [6th Cir 2009], *cert denied* 562 US 835 [2010]).

As to the adult book stores and theaters, Mixed Emotions's signage promotes private adult preview booths and adult toys and novelties. The store excludes minors. The adult section has 12 peep booths featuring adult movies, and the nonadult section sells sex toys and other sexually explicit merchandise.

Love Shack promotes its nonadult products above a sign promoting viewing booths. The store excludes minors, has eight peep booths featuring adult movies, and sells adult merchandise that is visible from the front nonadult section. Love Shack (Bronx) has at least eight peep booths featuring adult movies, sells adult novelties in the nonadult section, and advertises those items on signs outside the store.

Exquisite DVD publicizes itself as an adult establishment with a peep show sign on the front door, and has two areas containing buddy-style booths for the viewing of adult videos. Blue Door Video (Brooklyn) has seven peep booths for the viewing of adult movies, and sells rubber goods, lotions, and negligees in the nonadult section. Blue Door Video (Manhattan) has 24 peep booths featuring adult material, including 12 buddy-style booths, and sells adult novelties in the nonadult section. Further, in the nonadult section, there is a view of the adult section.

Gotham City Video (West Side) excludes minors, and has 10 buddy-style peep booths for viewing of adult videos. Video Xcitement has 10 peep booths featuring adult movies, and sells rubber goods, lotions, and leather clothing and harnesses in its nonadult section. Thunder Lingerie has neon signs on the front entrance and over the nonadult section that advertise "peep shows" featuring adult movies. The store restricts minors, and has a front-window display filled with adult novelties. While standing in the nonadult section, customers are able to view the materials in the adult section, as well as large signs announcing the store's 10 peep booths.

Amsterdam Video's window contains sexually explicit merchandise and the nonadult section features adult merchandise. Vihans Video has eight peep booths for viewing of adult movies, which are publicized in neon outside the store. It excludes minors. Former Pride NYC excludes minors, has 12 adult buddy-style peep booths featuring adult films, and sells adult items in its nonadult section.

Show World eliminated its live adult entertainment, stopped advertising live nude movies and "XXX Movies" on the marquee, eliminated "Peep-a live" booths, and revamped its former adult live-show space into a separate establishment (the Laugh Factory) for plays, film festivals, and comedy shows. However, it still has more than 60 peep booths featuring adult films, continues to restrict minors, and has outside signage promoting adult movies and private viewing booths.

Thus, eight of the stores have signs visible from the outside announcing the presence of peep booths or adult materials, and 12 stores that have peep booths promote them through either exterior and/or interior signage. Six of the stores have restrictions on minors. While plaintiffs argue that apart from "marital aids," which should not be considered adult materials for these purposes, the adult materials are relegated to the less accessible rear of the store, there is no basis for ignoring the presence of sexual aids and toys in the nonadult section as a factor in determining whether a store has a predominant sexual focus.

Even if the signage, due to its size, is not deemed a factor showing a predominant sexual focus, and even if minors are excluded because they are disruptive, that evidence does not outweigh the evidence of the sale of materials emphasizing "specified sexual activities" or "specified anatomical areas." It is undisputed that all of the stores sell such materials. Although

the stores may have reduced their stock of such materials to less than the 40% threshold, these materials remain a significant part of their business and the stores all place a significant emphasis on the promotion of such materials, based on promotional signage, window and interior displays and layouts promoting sexually focused adult materials and activities. Although there is no evidence suggesting "difficulties in accessing nonadult materials" at any of the stores (84 AD3d at 62), the lack of difficulty in accessing such materials, on its own, does little to show that a store lacks a sexual focus.

In sum, the City met its burden of establishing that the book and video stores are not "so transformed in character that they no longer resemble the kinds of adult uses found, both in the 1994 DCP Study and in studies and court decisions around the country, to create negative secondary effects" (6 NY3d at 84). This includes evidence that (1) all but one of the stores have numerous peep booths; (2) eight have signs visible from the outside announcing the presence of peep booths and/or adult materials, many of which are in neon; (3) all but one have a large selection of dildos and other sex toys for sale in the nonadult section of the store; (4) six exclude minors from the entire establishment; and (5) in many instances, the adult merchandise is visible from the nonadult areas and in five instances customers have to walk through adult areas to get to nonadult areas. Plaintiffs' protestations that the front of some stores contain nonadult material and is the predominant selling space, with adult material relegated to the back, ignores the many front window displays of graphic sexually explicit merchandise and signs promoting and pointing customers to the adult areas.

Since the 2001 Amendments are facially constitutional, we must determine the *Ten's Cabaret* plaintiffs' "as applied" challenge (*see* 84 AD3d at 65). Because the record is complete, I do not believe that there is a need to remand in this regard.

Although Ten's Cabaret and Pussycat Lounge adduced a fair amount of evidence showing that their businesses are no longer simply topless clubs, the record supports the finding that they retain a predominant sexual focus. At Pussycat, while the second floor and mezzanine are used for live music entertainment, the first floor features topless dancing on a stage every Monday through Saturday from noon until after midnight, and the club offers VIP suites and private dance areas. At Ten's, which has also been divided into two side-by-side clubs, the

adult club has two stages for topless dancing, as well as VIP areas with "champagne rooms" for private lap dances, which are open from the evening until the early morning and which feature between 10 and 25 dancers at any one time.[3] Thus, I find that the City is also entitled to a judgment upholding the constitutionality of the 2001 Amendments, as applied.

Accordingly, I would reverse the order on appeal and declare the 2001 Amendments constitutional in all respects.

MAZZARELLI, J.P., and FEINMAN, J., concur with KAPNICK, J.; ANDRIAS and DEGRASSE, JJ., dissent in an opinion by ANDRIAS, J.

Judgment, Supreme Court, New York County, entered October 10, 2012, affirmed, without costs.

---

**3.** By contrast, the City showed evidence of two 60/40 book stores that do not have these characteristics, and thus are not covered by the amended definition of "adult book store," notwithstanding their 60/40 configuration. Particularly, the evidence showed that Samantha Video and Empire DVD did not, inter alia, (1) have any adult-oriented signs outside their stores; (2) restrict minors from their premises; (3) offer dildos, rubber goods or lingerie for sale in their nonadult sections; (4) make customers pass through adult areas to get to nonadult areas or pay for their merchandise; or (5) provide peep booths for the viewing of adult films.