OPINION OF THE COURT
Louis B. York, J.
This decision combines two cases before the court. Both involve a challenge to the 2001 amendments to the City’s zoning law. For the People Theatres of N.Y., Inc. v City of New York (6 NY3d 63 [2005]) involved the validity of these amendments with regard to bookstores and video stores. Ten’s Cabaret v City of New York (id.) concerns the validity of those amendments with respect to topless nightclubs and bars. The plaintiffs are looking for a declaration of the unconstitutionality of the zoning law amendments and a permanent injunction against their enforcement.
I. Background
After separate bench trials of both actions (1 Mise 3d 394 [2003]; 1 Mise 3d 399 [2003]), the decisions were first reversed by the Appellate Division (20 AD3d 1 [2005]), modified by the Court of Appeals and remanded to this court for additional proceedings. The Court of Appeals emphasized in its remand that the issue to be determined was whether the dominant focus of these self-identified 60/40 businesses remained on sexual activities and matters and, therefore, are a sham or whether they had truly transformed themselves into nonadult entities. The answer to this question would decide whether or not the declaratoiy relief and injunction sought by the plaintiffs would be granted.
Additional briefs were submitted and argument was thereafter held. This court then issued a decision which found the zoning amendments constitutional (27 Misc 3d 1079 [2010]). However, the Appellate Division, in an extensive decision (84 AD3d 48 [2011]), remanded again, holding that the court’s decision did not adequately set forth the criteria and facts by which it made its ultimate determination. The Appellate Division and *665 the Court of Appeals instructed this court to consult the 1994 Department of City Planning Adult Entertainment Study (DCP Study), which served as the foundation for the City adopting the 1995 zoning law. It also stated on the remand that other studies and additional evidence could be added to the record. However, no such other studies have been submitted.
II. The Department of City Planning Study
1. The DCP Study was directed at then existing adult businesses.
2. The DCP Study was directed at adult businesses[1] which identified themselves through “graphic signage” and other forms of advertising (DCP Study at 1-2).
3. The DCP Study found that these adult enterprises generated the following negative secondary effects
a. increased crime rates;
b. an increase in the number of adult entities from 131 to 177 between 1984 and 1993 in New York City;
c. adult entertainment was more readily available than it was 10 years before through general interest video stores, those entities devoted exclusively to adult entertainment, cable television as well as newsstands and bookstores;
d. the clustering of such entities in central locations, such as Times Square, major vehicular routes, and Queens Boulevard and Third Avenue in Brooklyn;
e. a decrease in property values;
f. the negative views of community leaders, business people and community residents;
g. adult business signs were generally larger and more garish than nonadult business signs which community residents viewed as out of character with neighborhood character and
h. such signs expose children and teenagers to sexual images (DCP Study at VII-VIII); and
i. a general deterioration in the quality of life in the neighborhoods affected (DCP Study, at VII-VIII, 63-65).
4. Nothing in the DCP Study identified any internal characteristics of the adult entities.
After the DCP Study was published, amendments to the zoning law were promulgated in 1995 to deal with the problems re *666 vealed as to the adult entities. These new amendments caused the dispersal and elimination of many adult establishments by requiring them to be 500 feet from each other, residences, houses of worship and schools. It also required that to exist in such areas, a substantial portion of such organizations had to be devoted to nonadult uses. To enforce this last requirement, the 60/40 rule was enacted, meaning that less than 40% of the entities’ business could be devoted to adult activities. The City surmised that many of the adult entities that had allegedly transformed themselves into 60/40 establishments were using the 60/40 rule as a sham. They were, the City claimed, still setting their dominant focus on adult uses and entertainment, thus violating the zoning law. The current legislation was then passed, changing the criteria by which an entity was determined to be an adult enterprise:
i. customers had to pass through adult material to get to the nonadult section;
ii. whether any material exposed a customer to adult material;
iii. nonadult material was for sale while adult material was for sale or rent;
iv. more adult material was for sale than nonadult material;
v. minors were barred from entering the entire store or from any area featuring adult material;
vi. signs or window displays of adult matter were more prominent than signs or displays advertising nonadult matters;
vii. purchasing nonadult matter exposed a buyer to adult matter (Text Amendment N 010508 ZRY).
“Substantial portion” was eliminated from the definition of “adult establishment,” so that “An ‘adult establishment’ is a commercial establishment which is or includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof.” (NY City Zoning Resolution § 12-10 [adult establishment] [1].) The “substantial portion” standard continued for adult video and bookstores (id. [1] [a]). Adult commercial establishments emphasized specific sexual activities or depiction of specified areas of the human body (Text Amendment N 950384 ZRY).
III. Findings of Fact
A. Eating and Drinking Establishments
Ten’s Cabaret
1. Inspections by the city inspectors varied between more *667 customers in the adult sections to the opposite situation at other times.
2. The club regularly put together “Rock Candy,” which staged music and dancing, which consists of a gentlemen’s club with topless dancing.
3. Celebrity events were held in the nonadult portion.
4. “Room Service,” a component of Ten’s, was a major renovation designed to give a hotel atmosphere with a dance floor, private rooms containing mini refrigerators and couches.
5. Room Service has held events featuring such celebrities as Mariah Carey, Janet Jackson and Mo Vaughn.
6. Ten’s requires a cover charge allowing its patrons to go back and forth between the adult and nonadult sections.
7. The gentlemen’s club and the Room Service portion have separate entrances.
8. The two sections open and close on different time schedules with the gentlemen’s club open for a longer period.
Pussycat Lounge
9. The entire second floor of Pussycat Lounge was a restaurant accommodating patrons for dinner until the terrorist acts of 9/11 forced operations to cease.
10. When it opened six months later, it found it had lost its customer base for the restaurant and converted that space into an entertainment venue.
11. When it reopened, Pussycat Lounge booked bands on the second floor.
12. Through its leaflets and website, Pussycat Lounge advertised itself as a concert venue.
13. Pussycat Lounge frequently has more clientele on the second floor than on the first floor adult space for its concerts.
14. Pussycat Lounge advertises its adult and nonadult entertainment on separate websites.
Vixen
15. Vixen is located in Queens County at 60-07 Metropolitan Avenue.
16. Vixen offers a variety of nonadult activities such as jazz bands, poetry readings, bar mitzvahs and dancing.
17. It maintains a cabaret in the smaller portion of the premises where topless dancing takes place.
18. On special occasions the nonadult area has been alternatively designed into a school yard, a western saloon and an old- *668 fashioned speakeasy for the nonadult entertainment of its customers.
19. The Vixen website emphasizes the adult entertainment taking place at its location such as providing photos of the dancers and describes the theme of the club as fantasy and pleasure.
VIP Club
20. VIP Club is located at West 20th Street, Manhattan.
21. It has topless dancing on the first floor and a larger portion of the premises is located on the second floor restaurant.
22. The club attracts a significant number of its customers for its sushi.
23. During trial, the club owner testified that he was ready to invest $100,000 to $200,000 for corporate events and theme parties which would expand the number of his nonadult patrons.
24. VIP features topless dancers from Monday through Saturday and male dancers on Sunday.
25. Lap dancers are offered to customers in the adult portion of the premises.
26. Lap dancers are also offered in private rooms at both the first floor adult portion of the premises and on the second floor in the nonadult portion.
27. The website offers photographs of the entertainers.
Lace
28. At trial Lace had a gentlemen’s club on the first floor with topless entertainment.
29. Upstairs is a lounge, freshly painted.
30. The bar is being moved from the first floor to the second floor.
31. The gentlemen’s club exterior sign announces it as regularly featuring adult entertainment.
32. It advertises that it has adult entertainment on its website.
33. None of the city inspectors observed any customers or activity in the nonadult section on their visits to the premises.
34. Lace is located at 727 Seventh Avenue in Manhattan.
35. Lace II at 68 Eighth Avenue in Manhattan is operated in a similar fashion and figuration as Lace.
36. There is, however, a difference from Lace in the operation of the second floor which is a sports bar.
Private Eyes
37. It is located at 320 West 45th Street in Manhattan.
*669 38. It has outside awnings which advertise and proclaim “Adult Entertainment” and “sports Cabaret and Gentlemen’s Club.”
39. The adult portion of the club is on the left side of the space and the nonadult portion is on the right side.
40. In the adult portion, there is topless dancing as well as lap dancing with customers seated at tables and chairs dispersed about the room.
41. In the nonadult area is a bar and a stage on which bikini dancing is performed.
HQ
42. HQ’s address is 55 West 38th Street in Manhattan.
43. It has two floors with the adult section on the ground floor and the nonadult area on the second floor.
44. Topless dancing is performed on the ground floor on two stages with tables and chairs and an eating area.
45. The second floor offers dining to its customers.
Wiggles
46. Wiggles is located at 96-24 Queens Boulevard in Queens.
47. Wiggles features lap dances in its various rooms, and charges between $20 and $200 depending on which rooms they take place in.
48. Wiggles has topless dancing on its stage.
49. The nonadult section features couches, a coat check, chairs and a pool table.
Bare Elegance
50. Bare Elegance is venued at 216 West 50th Street in Manhattan.
51. Bare Elegance’s outside sign states “Bare Elegance Gentlemen’s Club and Lounge” and “Live Beautiful Models.”
52. The adult portion is in the front portion of the club consisting of a stage for topless dancers and a VIP room for lap dances.
53. The nonadult area contains a bikini bar and an open area with several couches.
B. Bookstores and Video Stores
Show World
55. The marquee of Show World at 669 Eighth Avenue in Manhattan has been changed considerably from advertising live *670 nude models, triple-X movies with a picture of a topless nude performer, to the elimination of any mention of adult performances, now promoting nonadult comedy performances.
52. All of the former one-on-one booths at an estimated value of $100,000 have been discarded.
53. Also eliminated were the “Peep-a live” booths valued at thousands of dollars.
54. The theater, formerly featuring live nude performances, was revamped for the showing of nonadult films.
55. Show World also produces in its theater off-off-Broadway productions including works by Chekhov and Shakespeare.
56. The adult space at Show World has been reduced to less than 20% of the floor space available to customers.
57. Show World also uses its theater space as a comedy club featuring stand-up comedians.
58. Show World advertises its nonadult activities in The Village Voice, Time Out and New York Magazine.
216 West 50th, Manhattan Bookstore
59. The outside signage of 216 West 50th Street promotes both adult and nonadult items. Its window display features general interest magazines such as Time and Newsweek.
Love Shack
60. The outside signs of Love Shack whose address is 139-14 246th Street in Queens promoted its nonadult products above the one reference to viewing booths, with the same size lettering for all.
61. There is also neon and lighted signage that only promotes DVDs, novelties and magazines and not the booths.
Exquisite DVD
62. Exquisite DVD, the address for which is 239 East 14th Street, Manhattan, has divided its nonadult merchandise according to category, including horror, comedy, action, etc., making it easier for customers to locate the nonadult items.
63. The nonadult portion of the store in the front includes such popular items as Rent, Fat Albert and Mama Mia, as well as DVDs featuring George Clooney, Will Smith and Cameron Diaz, and DVD players, video games and various accessories.
Blue Door Video
64. Blue Door Video is located at 946 Third Avenue in Brooklyn.
65. Only nonadult material is located in the front of the store.
*671 66. On a visit by a city inspector, customers in the nonadult section outnumbered customers in the adult section.
67. In the nonadult section, there are lotions, condoms, leather clothing, and a view of the adult section.
Blue Door Video
68. This Blue Door Video is venued at 87 First Avenue in Manhattan.
69. Nonadult material includes lingerie and sex toys.
70. There are 12 peep shows on the first floor and 12 peep shows in the basement.
Love Shack
71. This Love Shack is located at 3707 Provost Avenue in the Bronx.
72. The front of the store is devoted exclusively to nonadult merchandise.
73. It has eight peep booths. In the nonadult section there are adult novelties, condoms, lotions and a view of the adult section.
Gotham City Video
74. Gotham City Video, located at 687 Eighth Avenue in Manhattan also has located its nonadult videos in the front of the store.
Video Excitement
75. Video Excitement at 746 Third Avenue in Brooklyn locates its nonadult items in the front of the store.
76. In the nonadult section, there are rubber goods, lotions, leather and clothing for sale.
Thunder Lingerie
77. Thunder Lingerie has its address at 100 Greenwich Street in Manhattan.
78. The front of its store contains nonadult material, however, there is a neon sign on the front entrance and over the non-adult section advertising peep shows.
78a. Patrons were able to see through to the adult section from the nonadult section.
Amsterdam Video
79. The front of this store is also devoted to nonadult materials.
79a. There are no peep booths here.
79b. Its window display contains lingerie as well as adult and nonadult novelties.
*672 C. Miscellaneous
80. The record contains virtually no information to assist this court in determining the essential characteristics of these 60/40 establishments as compared to the essential characteristics of the 100% adult establishments.
81.1 find Michael Anastos a credible witness with an expertise in market research.
82. Anastos’ survey created in conjunction with Dr. Bryant Paul of Indiana University compared photos typical of the garish signs used to promote 100% adult businesses with signs promoting current 60/40 clubs. He then elicited the following conclusions from neighborhood residents which the court adopts as its factual findings:
a. the overall quality of life in the 60/40 clubs’ areas was better;
b. the 60/40 neighborhoods were safer;
c. the 60/40 neighborhoods were a more preferable place to live;
d. the 60/40 neighborhoods were a preferred shopping area.
83. The court finds Dr. Daniel Linz, a professor in the Department of Communications at the University of California at Santa Barbara, to be a credible witness who has specialized in the ways in which adult businesses affect communities.
84. Dr. Linz studied the secondary effects of 60/40 clubs in New York City and made the following findings, which this court adopts:
a. 60/40 clubs are not associated with negative secondary crime effects;
b. 60/40 clubs were not “hot spots”[2] for crime in their neighborhoods;
c. crimes did not increase with the opening of a 60/40 club;
d. crimes did not decrease after the closing of a 60/40 club.
85. Dr. Freeman undertook a study on the negative effects of 60/40 clubs on residential property values.
86. He made the following findings using the assessed values of the properties, which this court adopts:
a. proximity to a 60/40 club does not result in a diminution in value;
*673 b. the statistical analysis showed that a close proximity to a 60/40 club tended to increase property values.
87. Since the enactment of the 1995 amendments, adult establishments have dramatically declined in numbers.
88. Adult clubs have become far more widely dispersed since the enactment of the 1995 amendments.
89. The City’s expert witness, Dr. Richard McCleary, is not found to be credible by this court which accords no weight to his testimony.
90. Dr. McCleary is a statistician who holds no degrees in criminology or urban planning or studies.
91. He conducted no studies, except for a study in which he received a very poor 13.2% return rate from real estate brokers, nor was he aware of any other studies, except for the studies of Drs. Freeman and Linz.
92. He merely offered his ipse dixit opinions that adult clubs draw from a wide geographical area and cause an increase in crime in surrounding areas, patrons tend to carry cash, patrons are reluctant to call police when they are criminally victimized because of the stigma attached to frequenting such establishments. Because of the lack of any real world corroboration for those opinions, the court rejects them.
93. The court finds that the current signage for 60/40 entities is less garish, more subdued and, frequently, the 60/40 nonadult portion is equally or more prominent than the adult portion.
Decision
The Appellate Division remanded to this court for a more extensive opinion, asking for findings of fact from which its conclusions were drawn and an in-depth comparison of the characteristics of the 1994 adult institutions compared with the current 60/40 entities (84 AD3d 48 [2011]). In writing the decision on the first remand from the Court of Appeals, too much emphasis was placed on the easy burden this court understood the Court of Appeals had placed on the City. Moreover, the rational basis and substantial evidence tests were not appropriate means to determine the constitutional validity of the legislation in question.
In its criticism of the opinion, the Appellate Division stated that the test was not one of rational basis and substantial evidence, but the higher test of intermediate scrutiny. Reviewing all of the Appellate Division directions caused this court to look more deeply into the factual findings and the standards by *674 which to make its judgment. The burden on the City, then, is greater than previously understood. In doing that, this court could no longer justify its previous determination. Accordingly, the court decides that for the reasons discussed infra, the 2001 amendments are unconstitutional and must be vacated.
There is no need to deal with the applied challenge as the ordinance is being declared unconstitutional.
The DCP Study of 1994 was instituted because of the increased concern generated by an awareness of an increase in crime associated with the concentration in neighborhoods of what was then 100% adult establishments. Also recognized was a deterioration of the neighborhoods in which these businesses were clustered and a recognition by the inhabitants of the decline in the quality of life. There followed the 1995 amendments to the zoning law, establishing that to remain, those entities had to reorganize themselves so that a substantial portion of their inventory or area available to customers had to be non-adult. This morphed into the City’s guideline establishing the 60/40 rule which meant that less than 40% of the entity’s space or inventory had to be devoted to adult activities. Although 18 years have passed since that study and significant changes have occurred since the DCP Study, both the Court of Appeals in its remand and the Appellate Division remand after that, have directed this court not to consider any negative secondary effects of these changes. The ultimate question they have laid out, is whether the nature of these entities have so changed that they no longer resemble their 100% forebears. To do this, we must consider whether their nonadult features or characteristics predominate over their adult features.
One of the characteristics pointed out by the DCP Study was the concentration of adult businesses in particular neighborhoods. Now, due to the provisions of the 1995 ordinance, these entities are not able to exist in residential and many manufacturing and commercial neighborhoods, but where they are allowed to exist only one such entity is permitted in each zoning district, and must be at least 500 feet from each other and any school or house of worship. Thus, there are no more such concentrations. In contrast to the 1994 study, entities where the entire business contained 100% adult entities, all of the current entities studied, contain separate adult and nonadult sections with more product or space devoted to nonadult features. The nonadult portion is almost always located in the front of the entity with the adult section in the back, so that a patron can *675 visit the front and. never go to the back of the store, a distinct difference from the 1994 areas. In many of the entities, patrons in the nonadult section are unable to see what is going on in the adult section, a contrast to the 100% entities in the 1994 study. In most businesses, there are legitimate activities going on in the nonadult sections, which can be a restaurant, or a sports bar, or entertainment in the form of theater or celebrity entertainment, another feature distinct from its forbears. The exterior and interior signage has changed. There are almost no garish neon lighted signs, no hard-core sexual images or language on them and the nonadult signage is as prominent as the adult signage, certainly a significant change from the 1994 situation.
Finally, these entities are advertised in conventional newspapers, magazines, on TV and the Internet and on the entities’ own websites.
This decision certainly does not prevent the defendant from removing sham entities. The City need only change its guidelines to turn the 60/40 test into a rebuttable presumption. Then, even if less than 40% of the entity is devoted to adult purposes, the characteristics discussed can establish sham compliance. This court finds significant and distinct differences between the 1994 adult entities and 60/40 entities, so that the current establishments no longer resemble their 1994 predecessors. Given their current arrangements and secondary characteristics, these entities no longer operate in an atmosphere placing more dominance of sexual matters over nonsexual ones. Accordingly, there is no need for the 2001 amendments. On their face, therefore, they are a violation of free speech provisions of the US and State Constitutions.
Dicta
While these reflections form no part of this decision, this court cannot understand how an 18-year-old study of the negative effects of the 100% entities can be applied to the current 60/40 entities without determining the actual negative secondary effect of these institutions today. It was primarily the increased crime rates that spawned the 1994 DCP Study and led to the legislative changes in 1995 that this record shows was successful. New York State has a storied reputation for protecting freedom of speech. Its courts have consistently held that the content of speech cannot be regulated (People v Mobil Oil Corp., 48 NY2d 192 [1979]). What can be regulated are the negative secondary effects of the legislation in issue by virtue of the
*676 exercise of the police powers (Stringfellow’s of N.Y. v City of New York, 241 AD2d 360 [1st Dept 1997]). Here, no investigation was conducted by the defendants. Instead, there was a fictionalized reliance on the 1994 study. Without an actual study, the 2001 legislation should have been struck down, as urged by the three-judge Court of Appeals’ minority opinion in For the People (at 6 NY3d 88).
The court also questions the wisdom of applying this decision to self-identified 60/40 entities. It is entirely possible that some or even many of these establishments are not in fact 60/40 entities. As a result, false 60/40s could have resulted in the wrong decision on the statute and some legitimate 60/40 entities could have fallen by the wayside. This should have been avoided by an examination of the entities to determine the legitimacy of their 60/40 claim.
Isn’t, without a finding of negative secondary effects generated by the current 60/40 entities, what the City is really regulating — the content of expression — clearly a violation of the plaintiffs’ rights to freedom of speech (People v Mobil Oil Corp., 48 NY2d 192 [1979])?
Accordingly, it is ordered, adjudged and declared:
1. The temporary injunctions are vacated;
2. The 2001 amendments to the zoning law are an unconstitutional violation of the First Amendment;
3. The City of New York is permanently enjoined from enforcing the 2001 amendments to the zoning law.

. Businesses or entities which regularly feature entertainment or matters involving specified anatomical areas or specified sexual activities (Stringfellow’s of N.Y. v City of New York, 241 AD2d 360 [1st Dept 1997]).

. “Hot spots” are those locations with the most frequent calls to the police for services regarding crime in the immediate areas of the 60/40 clubs.