This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------------

No. 59
For the People Theatres of N.Y.
Inc., &c.,
            Plaintiff,
JGJ Merchandise Corp., &c.,
            Respondent,
        v.
City of New York, et al.,
            Appellants.
--------------------------------
Ten's Cabaret, Inc., &c., et al.,
            Respondents,
        v.
City of New York, et al.,
            Appellants.


            Ingrid Gustafson, for appellants.
            Erica T. Dubno, for respondent JGJ Merchandise Corp.
            Edward S. Rudofsky, for respondents Ten's Cabaret, Inc.
et al.
            First Amendment Lawyers Association, amicus curiae.



FAHEY, J.:

        Through a long, complicated, and confusing history, the

litigants have struggled over the application of zoning

regulations as they apply to New York City's adult entertainment

industry.  We hold that the City has met its burden of

demonstrating that the establishments affected by its 2001 zoning

- 1 -

amendments retained a predominant focus on sexually explicit materials or activities.  It follows, under our 2005 decision in this case, that the amendments do not violate plaintiffs' First Amendment rights.

I.

In 1994, the New York City Department of City Planning (DCP) completed a study of sexually focused businesses, namely "adult video and bookstores, adult live or movie theaters, and topless or nude bars," and identified significant negative secondary impacts, including increased crime, diminished property values, reduced shopping and commercial activity, and a perceived decline in residents' quality of life.  After public hearings, the City's Planning Commission issued a report, adopting the findings and conclusions of the study and noting that the businesses with adverse secondary impacts had "a predominant, on-going focus on sexually explicit materials or activities."

The next year, after further public hearings, the New York City Council added zoning regulations barring adult establishments from residential zones and most commercial and manufacturing zones, and mandating that, where permitted, adult businesses had to be at least 500 feet from houses of worship, schools, day care centers, and other adult businesses.

The 1995 Zoning Ordinance defined an "adult establishment" as a commercial establishment a "substantial portion" of which was "an adult book store, adult eating or

drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof."  In turn, an "adult book store" (a term meant to embrace stores selling or renting sexually explicit video material, as well as books and magazines) was defined as having a "substantial portion" of its "stock-in-trade" in, among other things, printed matter or video representations depicting "specified sexual activities" or "specified anatomical areas," as defined in the regulations.  An "adult eating or drinking establishment" was defined as an eating or drinking establishment that excludes minors and "regularly features" live performances or films emphasizing "specified sexual activities" or "specified anatomical areas," or where the employees regularly expose "specified anatomical areas" to patrons as part of their employment.

Certain adult establishments, including Stringfellow's of New York, Ltd. (the predecessor in interest of plaintiff Ten's Cabaret, Inc.), challenged the 1995 Ordinance, as violating their rights of free speech protected by the First Amendment of the Federal Constitution and article I, § 8 of the State Constitution.  This Court held that the Ordinance was content-neutral because it was not "purposefully directed at controlling the content of the message conveyed through adult businesses," but instead "was aimed at the negative secondary effects caused by adult uses, a legitimate governmental purpose" (Stringfellow's of New York v City of New York, 91 NY2d 382, 397,

399 [1998]).  We further ruled that the Ordinance was not broader
than necessary, since it "protect[ed] only those communities and
community institutions that are most vulnerable to . . . adverse
impacts" (id. at 400), and that reasonable alternative avenues of
communication were assured, because the zoning "allow[ed] adult
businesses to remain in districts that permit a wide mix of
commercial, retail, entertainment and manufacturing uses" and, in
almost every instance, were "within a 10-minute walk from a
subway line or a major bus route" (id. at 403).  The 1995
Ordinance was "not constitutionally objectionable" (id. at 406)
under the standards of Renton v Playtime Theatres, Inc. (475 US
41 [1986]) and Matter of Town of Islip v Caviglia (73 NY2d 544
[1989]).  Although we did not use the term "intermediate
scrutiny" in Stringfellow's, it is clear that we applied this
standard insofar as we determined whether the ordinance was
narrowly tailored to serve a substantial governmental interest
and allowed for reasonable alternative channels of communication.

Meanwhile, the City's Department of Buildings and its
Planning Commission, in an effort to give clarity to the concept
of an establishment's "substantial portion," determined in a 1998
Operation Policy and Procedure Notice that any commercial
establishment with at least 40 percent of its customer-accessible
floor/cellar area or stock-in-trade used for adult purposes
qualified as an adult establishment.  Thus emerged the so-called
60/40 test, which was applied to identify adult bookstores and

adult eating or drinking establishments alike.

As the City began to enforce the 1995 Ordinance, it concluded that adult establishments were achieving technical compliance with the 60/40 test, but without altering their predominant focus on sexually explicit activities or materials. As the City saw it, the 60/40 businesses were engaged in a "sham."  In one case, the City sought to shut down a store that complied with the test, insofar as just 24% of its stock consisted of adult videos, but where the nonadult videos were offered only for sale, not for rent, did not sell profitably, had been supplemented very modestly, and were located in a back room. This Court ruled in City of New York v Les Hommes (94 NY2d 267 [1999]) that the zoning resolutions must be enforced as written, without considering such factors as whether the nonadult stock was unprofitable or located in a remote part of the premises.

DCP then applied to the Planning Commission for amendments to the ordinance.  The Planning Commission held further public hearings and issued a report endorsing the proposed amendments.  In 2001, the City Council approved significant changes to the zoning regulations, greatly reducing the significance of the 60/40 test.

With respect to "adult eating or drinking establishments," the 2001 Amendments removed "substantial portion" from the definition, providing instead that a venue is covered if it regularly features live performances characterized

by an emphasis on certain "specified anatomical areas" or "specified sexual activities" in any portion of the establishment, regardless of whether it limits those performances to less than 40% of its floor area.  In other words, a club featuring topless or nude dancers qualifies as an "adult eating or drinking establishment" no matter the proportion of its space devoted to adult entertainment.

With regard to adult bookstores, the 2001 Amendments formally kept the 60/40 test, with the added provision that if a store passes the test, but meets at least one of eight criteria, then the store's non-adult material will not be considered stock-in-trade for the purpose of the "substantial portion" analysis.  For example, if a store has peep booths, i.e. enclosures "where adult movies or live performances are available for viewing by customers," then it qualifies as an adult bookstore, no matter how many nonadult video discs and magazines it stocks.

The 2001 Amendments are the subject of the actions that we now consider, for the second time, today.

## II.

In 2002, plaintiffs For the People Theatres of N.Y., Inc., which showed adult films, and JGJ Merchandise Corp., an adult video store also known as Vishans Video and as Mixed Emotions, brought an action against the City, its Mayor, the Director of City Planning, and the Commissioner of Buildings

(collectively, the City).  Both companies had reconfigured their establishments prior to the 2001 Amendments to comply with the 60/40 test.  Plaintiffs sought a judgment declaring the definitions of "adult theater" and "adult bookstore" in the 2001 Amendments to be facially unconstitutional, as a violation of free speech.  They argued principally that the City failed to support the amended regulations with a study aimed at the specific secondary effects of the class of 60/40 businesses.  At the same time, plaintiffs Ten's Cabaret, Inc., Pussycat Lounge, Inc., and two other topless clubs, which have since closed, commenced a similar action challenging the definition of "adult eating or drinking establishment" in the 2001 Amendments.  The actions were ultimately consolidated.

Ten's Cabaret moved for summary judgment, all plaintiffs moved for a preliminary injunction against enforcement, and the City cross-moved for summary judgment. Plaintiffs argued that the City, in seeking to amend the 1995 Ordinance, had improperly relied on the 1994 DCP Study that led to the original zoning regulations, and had failed to generate any new empirical data regarding the purported adverse secondary effects of 60/40 establishments, even though the entities were, according to plaintiffs, very different from the businesses reviewed in the DCP Study.  For the People Theatres of N.Y. and JGJ Merchandise submitted affidavits and reports of two experts, an economist and a criminologist, who opined that 60/40

bookstores and theaters do not negatively affect property values or have adverse consequences in the form of increased criminal complaints.  The remaining plaintiffs produced a 2001 NYPD report listing only one topless club in Manhattan with violations and similar documents suggesting that nightclubs other than adult establishments were perceived by the police as more problematic at the time.  For its part, the City contended that a new study was not necessary because the City Council had rationally found that the 60/40 clubs and stores retained a predominant, ongoing focus on sexually explicit entertainment, which had already been determined to give rise to negative secondary effects.

In 2003, Supreme Court denied the City's cross motions for summary judgment, granted plaintiffs' motions for summary judgment, declared the 2001 Amendments unconstitutional, and enjoined their enforcement (see 1 Misc 3d 394, 397 [Sup Ct, NY County 2003]; 1 Misc 3d 399, 407 [Sup Ct, NY County 2003]). Supreme Court held that defendants were "constitutionally required to provide evidence showing that the 60/40s did not remedy the secondary effects" (1 Misc 3d at 408-409).

The Appellate Division reversed Supreme Court's judgments, denied plaintiffs' motions, granted the City's motions, vacated the injunction, declared the 2001 Amendments constitutional, and dismissed the complaints (see 20 AD3d 1 [1st Dept 2005]).  The Appellate Division reasoned that a new "secondary impacts" study was not required because the sexual

character of the businesses had not changed when they became 60/40 businesses, and plaintiffs had failed to furnish evidence that would shift the evidentiary burden back to the City (see id. at 21).

### III.

In 2005, this Court modified the Appellate Division's order, by denying the City's motions for summary judgment, and remitted the matter for further proceedings (see 6 NY3d 63 [2005]).

We applied the United States Supreme Court's burden-shifting framework established in Los Angeles v Alameda Books, Inc. (535 US 425 [2002]), which set out what a municipality must prove in order to sustain a zoning ordinance that regulates adult businesses in the face of a First Amendment challenge.

Briefly, in Alameda Books, the Supreme Court set out a three-part burden-shifting framework for determining the constitutionality of zoning that regulates adult establishments.[1]

---

[1] In Alameda Books, the plurality, assuming without deciding that a Los Angeles adult use zoning ordinance was content-neutral (see Alameda Books, 535 US at 441), set out the three-part framework. Justice Kennedy, concurring in the judgment on the narrowest grounds, expressed the view that zoning restrictions on adult businesses are in reality "content based and we should call them so" (id. at 448 [Kennedy, J., concurring]), but nevertheless reasoned that "[a] zoning restriction that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny" (id. at 448 [Kennedy, J., concurring]), and agreed with the plurality's framework, including what Justice Kennedy called the requirement of "very

First, a "municipality's evidence must fairly support the municipality's rationale for its ordinance" (id. at 438). Second, the municipality prevails "[i]f plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings" (id. at 438-439). Third, "[i]f plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance" (id. at 439).

In our 2005 decision, this Court interpreted Alameda Books to mean that, with respect to the first stage, "a municipality's burden to prove that it has a substantial interest in regulating a particular adult activity is not a very heavy one" (6 NY3d at 80). We explained that

> "the reasonable discretion accorded most
> local legislative actions extends to adult
> use zoning. A local government implementing
> zoning that affects adult businesses must
> have a legislative record that establishes a
> substantial governmental interest in the
> subject matter of the regulation to justify
> restrictions on protected speech; however,
> the local government retains discretion to
> make its findings from studies or other
> supportive information before it, and to draw
> reasonable conclusions about which regulatory
> techniques will be most beneficial in
> addressing the findings" (id. at 81).

_____

little evidence" by the municipality (id. at 450-451 [Kennedy, J., concurring]).

We noted, however, that, under <u>Alameda Books</u>, if plaintiffs demonstrate that the municipality's evidence does not support its rationale or provide evidence disputing the municipality's factual findings, then "the burden shifts back to the municipality to supplement the record" (<u>id.</u> at 79-80, quoting <u>Alameda Books</u>, 535 US at 439).

First, we held that the City had satisfied its initial burden to justify a rationale for the 2001 Amendments. "Here, the City cites the 1994 DCP Study, . . . and its subsequent enforcement experiences to demonstrate that while many adult businesses may comply with the 1995 Ordinance, at least technically, their essential character remains unchanged. It is this essential character -- as adult bookstores or adult video stores or strip clubs or topless clubs -- that creates negative secondary effects" (6 NY3d at 81). We parted from the Appellate Division at the second stage of <u>Alameda Books</u>, holding that plaintiffs had furnished evidence disputing the City's factual findings, shifting the burden back to the City to supplement the record with evidence renewing support for its rationale.

Significantly, however, we stated that the City is "not required . . . to relitigate the secondary effects of adult uses, or to produce empirical studies connecting 60/40 businesses to adverse secondary effects" (<u>id.</u> at 83), and that the sole remaining question of fact is "whether 60/40 businesses are so transformed in character that they no longer resemble the kinds

of adult uses found . . . to create negative secondary effects"
(id. at 83-84).  The limited scope of the remand was explained by
our observation that "[t]he City justified the 2001 Amendments as
a measure to eradicate the potential for sham compliance with the
1995 Ordinance, and thus to reduce negative secondary effects to
the extent originally envisaged" (id. at 81).

We gave the following specific guidance to the lower
courts regarding our remand:

> "we anticipate that the City will produce
> evidence relating to the purportedly sham
> character of self-identified 60/40 book and
> video stores, theaters and eating and
> drinking establishments or other commercial
> establishments located in the city.  This
> does not mean that the City has to perform a
> formal study or a statistical analysis, or to
> establish that it has looked at a
> representative sample of 60/40 businesses in
> the city.  If the trier of fact determines,
> after review of this evidence, that the City
> has fairly supported its position on sham
> compliance -- i.e., despite formal compliance
> with the 60/40 formula, these businesses
> display a predominant, ongoing focus on
> sexually explicit materials or activities,
> and thus their essential nature has not
> changed -- the City will have satisfied its
> burden to justify strengthening the 1995
> Ordinance by enacting the 2001 Amendments,
> and will be entitled to judgment in its
> favor.  If not, plaintiffs will prevail on
> their claim that the 2001 Amendments are
> insufficiently narrow and therefore violate
> their free speech rights" (id. at 84
> [emphases added]).

IV.

Following discovery, the City presented evidence in two
bench trials, concerning the characteristics of some 14 adult

bookstores and 10 adult eating and drinking establishments (as defined by the 2001 Amendments), which identified themselves as compliant with the 60/40 test. Managers or owners testified about efforts to reconfigure premises in accordance with that rule, while Office of Special Enforcement inspectors described the adult establishments, contrasting them with two nonadult video stores. Photographs of the adult establishments, pages from the topless clubs' websites that included images promoting the attributes of individual dancers, and video recordings of the adult bookstores were entered into evidence.

The trial court upheld the amended zoning regulations in 2010, as to both the adult bookstores and the adult eating or drinking establishments, and entered judgments in favor of the City (see 27 Misc 3d 1079 [Sup Ct, NY County 2010]). Supreme Court emphasized that under the standard imposed by our 2005 decision "the City's burden was a 'light' one" and that the City had "provided substantial evidence" as to the "dominant, ongoing focus" of the bookstores and topless clubs on sexually explicit materials and activities (id. at 1089).[2]

In 2011, the Appellate Division reversed, vacated the findings of constitutionality, and remanded (see 84 AD3d 48 [1st Dept 2011]). The Appellate Division ruled that the trial court

---

[2] The trial court ruled in favor of the adult theater, For the People's Theatres, N.Y. (see 27 Misc 3d at 1089), and the City did not appeal this part of the judgment.

had failed to specify "the criteria by which it determined that the plaintiffs' essential nature was similar or dissimilar to the sexually explicit adult uses" underlying the 1995 Zoning Ordinance and had "failed to state the particular facts on which it based its judgment" (id. at 59).

The Appellate Division also concluded that Ten's Cabaret and Pussycat Lounge had brought an "inartfully pleaded" as-applied challenge, and that the trial court had failed to set out findings of fact pertinent to that claim (id. at 64-65). Notably, however, no as-applied challenge had been before this Court in 2005 when we remanded.

The Appellate Division instructed the trial court on remand to use various characteristics of adult establishments identified in DCP's 1994 study to determine whether the 60/40 businesses retained a predominant focus on sexually explicit materials or activities.

> "For example, the presence of large signs advertising adult content may indicate a predominant focus on promoting sexually explicit materials.  The same is true of a significant emphasis on the promotion of materials exhibiting 'specified sexual activities' or 'specified anatomical areas,' as evidenced by a large quantity of peep booths featuring adult films.  Other indicators of a predominant focus on sexually explicit materials might be the exclusion of minors from the premises on the basis of age or difficulties in accessing nonadult materials" (id. at 61-62 [footnotes omitted]).

The Appellate Division stated that "the City's evidence

is subject to intermediate scrutiny" (id. at 59 n 6), and instructed that the trial court should hold the City to a more "heightened standard" (id. at 63) than it had in 2010.  At the same time, however, the Appellate Division mentioned that "'very little evidence is required' to uphold the constitutionality of the 2001 Amendments" (id. at 62, quoting Alameda Books, 535 US at 451 [Kennedy, J., concurring]), and signaled that if the trial court found that most 60/40 establishments had any one of the characteristics of adult establishments identified in the 1994 study, then the City would have "more than enough evidence to justify the City's 2001 ordinances" (84 AD3d at 63 n 12; see also 131 AD3d 279, 289 [1st Dept 2015]).

V.

On remand, the City relied upon the prior record.

In 2012, the trial court struck down the 2001 zoning regulations as to adult eating and drinking establishments and adult bookstores as an unconstitutional violation of the First Amendment, enjoining the City from enforcing them (see 38 Misc 3d 663 [Sup Ct, NY County 2012]).

The trial court's findings of fact regarding the adult eating and drinking establishments were as follows.

Ten's Cabaret had divided itself into two clubs, with separate entrances and operating hours: a gentlemen's club featuring topless dancing and a nonadult entertainment facility named "Room Service," consisting of private suites used for

celebrity events.  Similarly, Pussycat Lounge had a nonadult section in the form of a concert venue named "Catbar," with its own website, which frequently had more clientele than the topless club did.  Another adult eating and drinking establishment, Vixen, offered both adult and nonadult entertainment, although its website emphasized the former.  VIP Club offered topless dancing on its first floor and sushi dining on the second floor; dancers offered individual "lap dances" to patrons in private rooms on both floors.  Lace and Lace II had topless clubs on their first floors, and a nonadult lounge and a sports bar on their respective second floors.  Private Eyes, which advertised itself on awnings as a "[S]ports Cabaret and Gentlemen's Club," comprised an adult entertainment portion featuring topless dancers and lap dances and a nonadult bar with bikini dancing. The same was true of Bare Elegance, which described itself on exterior signage as a "Gentlemen's Club and Lounge" with "Live Beautiful Models."  HQ offered topless dancing on the ground floor and dining facilities for patrons on the second floor.  At Wiggles, topless dancing and lap dances were on offer, and the nonadult section provided patrons with a coat check, pool table, and seating.

With respect to the adult bookstores, the trial court made the following findings.

Plaintiff JGJ Merchandise promoted both adult and nonadult items in its exterior signage and featured a window

display of general interest magazines.  Love Shack (Queens) promoted its nonadult products above a single reference to viewing booths, with the same size of lettering for both and no lighted or neon signage of the booths.  Exquisite DVD had divided its nonadult merchandise according to category, making specific nonadult items easier to find.  The nonadult material was located in the front of the store.  At Blue Door Video (Brooklyn), the nonadult materials were in the front of the store, and customers in the nonadult section outnumbered customers in the adult section, but the adult section was visible from the nonadult section.  At Blue Door Video (Manhattan), there were 24 peep booths.  Both Blue Door Video stores sold condoms, sex aids, and/or sex toys in their nonadult sections.  Love Shack (Bronx) sold adult novelties, sex aids, and condoms in the nonadult section, in the front, which afforded customers a view of the adult section, featuring 8 peep booths.  Gotham City (8th Avenue) kept its nonadult videos in the front of the store.  Video Xcitement sold sex toys and sex aids in its nonadult section, in the front of the store.  Show World no longer featured peep booths with live models or nude theater performances, but rather promoted comedy club performances and off-off-Broadway productions, advertised in city magazines.  Its marquee did not mention adult performances.  At Thunder Lingerie, a neon sign in the front entrance advertised peep shows and customers were able to see from the nonadult section to the adult section.  The front

of Amsterdam Video was devoted to nonadult materials and there were no peep booths in that store.

The trial court found that the nonadult sections of the adult bookstores were "almost always located in the front . . . with the adult section in the back, so that a patron can visit the front and never go to the back of the store" (38 Misc 3d at 674-675).  The trial court also observed that almost none of the adult establishments displayed "garish neon lighted signs" or "hard-core sexual images or language," and that "the nonadult signage is as prominent as the adult signage" (id. at 675).

Based on these findings, the trial court concluded that plaintiffs "no longer operate in an atmosphere placing more dominance of sexual matters over nonsexual ones.  Accordingly, there is no need for the 2001 Amendments.  On their face, therefore, they are a violation of free speech provisions of the US and State Constitutions" (id. at 675).  The trial court accordingly enjoined the City from enforcing the 2001 Amendments.

Supreme Court noted that it was applying a different standard in 2012 than in 2010, because the Appellate Division had

> "stated that the test was not one of rational
> basis and substantial evidence, but the
> higher test of intermediate scrutiny.
> Reviewing all of the Appellate Division
> directions caused this court to look more
> deeply into the factual findings and the
> standards by which to make its judgment.  The
> burden on the City, then, is greater than
> previously understood" (id. at 673-674).

Having ruled the 2001 Amendments facially

unconstitutional, the trial court did not reach the topless clubs' as-applied challenge identified by the Appellate Division (see id. at 674).

A divided Appellate Division affirmed Supreme Court's judgment in 2015 (see 131 AD3d 279 [1st Dept 2015]). The court applied the criteria it had suggested in 2011 for determining whether the 60/40 businesses retained a predominant focus on sexually explicit materials: "(1) the presence of large signs advertising adult content, (2) significant emphasis on the promotion of materials exhibiting 'specified sexual activities' or 'specified anatomical areas,' as evidenced by a large quantity of peep booths featuring adult films, (3) the exclusion of minors from the premises on the basis of age, and (4) difficulties in accessing nonadult materials" (id. at 289).

First, the Appellate Division considered the adult bookstores. With respect to signage, the Appellate Division affirmed the trial court's findings that the signs advertising adult content were not large, graphic, or garish, and that the nonadult signage was as prominent as the adult signage (see id. at 290). As to the prohibition of minors, the Appellate Division found that this was not a significant factor, with 6 of the 13 adult bookstores permitting minors (see id. at 291). With respect to ease of access to nonadult materials, the Appellate Division affirmed the trial court's finding that most of the stores kept the nonadult materials in the front of the stores,

making them easy to find (see id.).

However, as to emphasis on promoting sexually explicit materials, the Appellate Division found that the adult book stores "all place[d] a significant emphasis on the promotion of such materials, based on promotional signage, window and interior displays and layouts promoting sexually focused adult materials and activities," and that the record evidence established that all but one of the stores had peep booths, with an average of about 17 booths per store (id.). The Appellate Division noted that "[t]his evidence supports the City's argument that the stores are predominantly sexually focused" (id.).

Nonetheless, the Appellate Division concluded that because "three of the four factors tend not to support the City's position, . . . the City has not met its burden with respect to the adult video and book stores" (id.).

The Appellate Division then turned to the adult eating and drinking establishments. As to signage, the Appellate Division noted that there was no record evidence of the size or quality of the signs advertising "gentlemen's clubs" and the like (see id. at 293). With regard to prohibition of minors, the Appellate Division found that this was again not a significant factor "since minors are presumably excluded because alcohol is served at the premises, not because of a focus on adult material" (id. at 293 n 11). As to ease in accessing the nonadult section, the Appellate Division found "no evidence in the record that

these configurations make the nonadult sections difficult to access" (id. at 293).

On the other hand, the Appellate Division found that the evidence adduced by the City "shows that topless dancing takes place at all times daily for approximately 16 to 18 hours a day and that lap dances are provided in both public and private areas of the club" (id. at 292). The Appellate Division concluded that "the 60/40 clubs regularly feature topless dancing and lap dancing in a substantial portion of their overall space. This, coupled with the evidence regarding some of the clubs' website and newspaper advertisements,. . . indicates a predominant sexual focus in most of the clubs" (id. at 292-293).

Again, however, the Appellate Division concluded that because three of the four factors did not support the City's position, the City has not carried its burden, suggesting that "satisfaction of one of the factors is not sufficient to meet the City's burden" (id. at 293).

Two Justices dissented. The dissenters believed that the City had "sustained its burden as to sham compliance by demonstrating that by and large the essential character of the 60/40 businesses has not changed, even if their physical structure has" (id. at 295 [Andrias, J., dissenting]).

The dissenting Justices gave the following reasoning.

> "Substantial evidence demonstrates that, notwithstanding the present availability of additional amenities or certain nonadult uses of their space, the adult eating and drinking

establishments used for illustrative purposes retained a predominant sexual focus. These establishments typically feature topless dancing by multiple dancers on a daily basis for approximately 16 to 18 hours a day . . . with lap dancing provided in both the adult and the nonadult areas. . . .

"The adult book stores and video stores also retained a predominant focus on sexual materials or activities. The evidence of promotion, based on signage, displays in some front windows and throughout the stores, and layout, combined with the evidence of the presence of large numbers of peep booths and the evidence of the sale of adult sex toys in the nonadult sections of the stores, demonstrates that most of the stores . . . emphasized the promotion of sexual materials over nonadult materials" (id. at 300-302 [Andrias, J., dissenting] [footnote omitted]).

The dissenters focused on the majority's use of an improper legal standard.

"The majority's mechanical and mathematical approach, under which the predominant sexual focus in the 60/40 businesses' activities is quantitatively outweighed by signage, policies towards minors, and layouts, is inadequate under the dictates of the Court of Appeals and this Court, and elevates the City's burden of proof. In identifying certain factors relevant in assessing the character of the adult establishments, this Court did not call for a mechanical application by which each factor is to be weighted equally and tallied to arrive at a quantitative conclusion" (id. at 302 [Andrias, J., dissenting] [emphasis added]).

The City appealed. Because the two-Justice dissent was on a question or questions of law in appellants' favor, we have jurisdiction over this appeal under CPLR 5601 (a).

VI.

It is the City's burden to show that the adult businesses retained a predominant, ongoing focus on sexually explicit materials or activities.  As described above, Alameda Books sets out a three-part burden-shifting framework for determining the constitutionality of adult use zoning, which we followed in our 2005 decision.  The analytical issue that remains at this point in the litigation concerns the burden of proof that the City must sustain in order to prevail at the third stage, after the burden has shifted back to the City to supplement the record.  This narrow issue is distinct from, but related to, the question of the overall level of constitutional scrutiny.

As we have noted, we apply intermediate scrutiny in the adult use zoning context.  In Stringfellow's (91 NY2d 382), in keeping with federal precedent (see Renton, 475 US at 50), we properly applied intermediate scrutiny to the question whether the City's purpose justified the original zoning ordinance, considering whether the ordinance was narrowly tailored to the City's purpose or else broader than necessary, and whether reasonable alternative avenues of communication were assured.  We briefly reiterated in our 2005 decision that the intermediate scrutiny standard was applicable (see 6 NY3d at 81).

The relation between the level of scrutiny and the burden of proof to be met by the City may be explained as follows.  Intermediate scrutiny is a level of judicial review

that applies to the overall determination as to whether a government's purpose justifies a law, i.e., here whether the zoning regulation is narrowly tailored to serve a substantial governmental interest and allows for reasonable alternative avenues of communication (see Renton, 475 US at 47, citing Clark v Community for Creative Non-Violence, 468 US 288, 293 [1984]; City Council of Los Angeles v Taxpayers for Vincent, 466 US 789, 807 [1984]); Heffron v International Society for Krishna Consciousness, Inc., 452 US 640, 647-648 [1981]).  A court conducting an intermediate scrutiny test (as with any level of scrutiny) must reach legal determinations, as to the balancing of interests, but the court must also assess the government's factual or predictive judgments (see e.g. District of Columbia v Heller, 554 US 570 [2008]; Turner Broadcasting System, Inc. v FCC, 520 US 180 [1997]).  For example, we had to determine in Stringfellow's whether the 1995 Ordinance was indeed aimed at combating negative secondary effects.  Whether adult establishments create negative secondary effects is such a factual matter.  So is whether the adult establishments retain an ongoing predominant focus on sexually explicit activities and materials.  The question, then, is what burden of proof the government must bear in such matters when the overall test is intermediate scrutiny.

The United States Supreme Court has instructed that in First Amendment cases applying intermediate scrutiny, a court's

task, when reviewing a legislature's factual or predictive judgments, is "to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence" (Turner Broadcasting System, Inc., 520 US at 195; see e.g. Abilene Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson Cty., Kan., 492 F3d 1164, 1174 [10th Cir 2007], cert denied 552 US 1296 [2008]).  Indeed, the Supreme Court has remarked that "substantiality is to be measured in this context by a standard more deferential than we accord to judgments of an administrative agency" because a legislature is best equipped "to amass and evaluate the vast amounts of data bearing upon legislative questions" (Turner Broadcasting System, 520 US at 195 [internal quotation marks omitted] [emphasis added]).  Municipalities have unique knowledge of local problems and suitable solutions.  For these reasons, we hold that the same deferential standard is applicable under our state constitutional law to a municipality's factual or predictive judgments in the adult use zoning context.

Our 2005 decision in this litigation applied the appropriate standards.  In discussing whether the City had met its initial burden at the first stage of Alameda Books, this Court noted that "a municipality's burden to prove that it has a substantial interest in regulating a particular adult activity is not a very heavy one" (6 NY3d at 80) and we quoted Justice Kennedy's concurrence in Alameda Books, which stated that "very little evidence is required" because generally "courts should not

be in the business of second-guessing fact-bound empirical assessments of city planners" (id., quoting Alameda Books, 535 US at 451 [Kennedy, J., concurring]).  We ruled that given this modest evidentiary burden, the City had satisfied its initial "burden to justify a secondary-effects rationale for the City's 2001 Amendments" (6 NY3d at 81-82).

Then, in setting out what the City would have to show at the third Alameda Books stage, we clearly implied that the same evidentiary burden would apply.  In particular, we required evidence that "fairly support[s]" the conclusion that there is an ongoing focus on the sexually explicit (id. at 84).  The "fairly support" language was drawn from Alameda Books, which stated that, at the first stage of the three-part framework, a municipality, seeking to show a relation between speech and a government interest, "may rely on any evidence that is reasonably believed to be relevant" (Alameda Books, 535 US at 438 [internal quotation marks omitted]), but cannot "get away with shoddy data or reasoning," and must adduce evidence that "fairly support[s] the municipality's rationale for its ordinance" (id.).  We further emphasized the modest burden placed upon the City at the third stage by noting that the City need not "perform a formal study or a statistical analysis, or . . . establish that it has looked at a representative sample of 60/40 businesses in the city" (6 NY3d at 84).

Our intent in 2005 was that the City, in demonstrating

an ongoing focus on the sexually explicit, must meet the same
evidentiary burden at the third <u>Alameda Books</u> stage that it had
to meet at the first stage.

                              VII.

        For these reasons, the Appellate Division, in the
decision on appeal, erred in stating that the City's modest
evidentiary burden related only to the first stage of <u>Alameda
Books</u> (<u>see</u> 131 AD3d at 289).  The guidance delivered by the
Appellate Division to the trial court during this litigation
confused the ultimate standard of review or constitutional
scrutiny to be applied with the evidentiary burden borne by the
City.  The Appellate Division noted in 2011 that "the City's
evidence is subject to intermediate scrutiny" (84 AD3d at 59 n
6), and instructed the trial court to "assess the City's evidence
in light of this somewhat heightened standard" (<u>id.</u> at 63).
Supreme Court interpreted this to mean "that the test was not one
of rational basis and substantial evidence, but the higher test
of intermediate scrutiny" (38 Misc 3d at 673-674).

        The lower courts' discussions and applications of
intermediate scrutiny misconstrued the standard.  There is no
conflict between intermediate scrutiny and application of a
modest burden of proof akin to substantial evidence.  The trial
court's 2010 assessment of the City's evidentiary burden as "a
'light' one" (27 Misc 3d at 1089) was in fact correct, and it
erred in 2012 when it eschewed any standard such as substantial

evidence and held the City to a higher burden of proof (see 38 Misc 3d at 673-674).  Properly understood, the trial court's task was to decide whether the City had relevant evidence reasonably adequate to support its conclusion that the adult establishments retained a predominant, ongoing focus on sexually explicit activities or materials.

The Appellate Division in the decision on appeal exacerbated its earlier misguidance to the trial court by applying a rigidly mechanical approach to the determination of whether a predominant focus on sexually explicit entertainment remained.  This too was error.  As the dissent observed, the majority's four-prong checklist, with each factor weighing equally, placed subsidiary considerations such as signage on equal footing with the touchstone issue of emphasis on the promotion of sexually explicit activities or materials. Moreover, the Appellate Division counted factors that gave no support either to the City's conclusion or to plaintiffs' position (such as exclusion of minors by the topless clubs or lack of a uniform practice on exclusion of minors by the adult bookstores) as if they affirmatively counted against the City.

In addition, the Appellate Division's approach lost sight of the fact that the issue was whether there was sham compliance.  A bookstore could very well engage in such a sham by removing large signs, allowing minors to enter, and ensuring that non-adult materials are accessible, and yet retain a focus on

sexual materials.  A store that stocks non-adult magazines in the front of the store but contains and prominently advertises peep booths is no less sexual in its fundamental focus just because the peep booths are in the back and the copies of Time magazine in the front.  The same is true of the adult eating and drinking establishments.  A topless club is no less an adult establishment if it has small signs and the adjoining comedy club, seating area, or bikini bar is easy to access.

Additionally, since the City bore only a modest burden of proof akin to substantial evidence, it was error for the Appellate Division to assume that "satisfaction of one of the factors" alone could not be "sufficient to meet the City's burden" (131 AD3d at 293).

## VIII.

Viewed in the proper light, the evidence and the factual findings of the lower courts support only one conclusion: that the City met its burden of showing continued focus on sexually explicit activities and materials by the adult bookstores and adult eating and drinking establishments.

The Appellate Division found that all but one of the adult bookstores had peep booths for viewing adult films, with an average of about 17 booths per store.  Peep booths, by design, obviously promote sexual activities.  The Appellate Division further found that all the bookstores used signage, displays, and layouts to promote sexually focused adult materials and

activities.  In addition, as the trial court found, many of the adult bookstores sold sex toys, adult novelties, and the like in the nonadult sections of the stores.  This evidence showed that most of the adult bookstores predominantly emphasized the promotion of sexual materials and activities.

Contrary to the Appellate Division, this substantial evidence is in no way negated by the fact that the signs promoting the peep booths were "not graphic" or the fact that "there is no evidence that any of the stores have adult signs that are larger than those of nearby nonadult businesses, or even that the signs advertising adult content are large" (131 AD3d at 290).  The very existence of signs advertising peep booths indicates a continued sexual focus, regardless of their size.  We cannot accept the idea that there is something uniquely sexual about "XXX" signs, as opposed to other signs advertising "Peep Booths."  Whether signs are garish has little bearing on whether a business retains a sexual focus.

In short, the evidence credited by the Appellate Division supports one conclusion alone: that the adult bookstores continue to have a predominant focus on sexually explicit materials and activities.

As to the adult eating and drinking establishments, the Appellate Division found that, in all the clubs, "topless dancing takes place at all times daily for approximately 16 to 18 hours a day" and also that lap dances, a quintessentially sexual

activity, were offered by dancers "in both public and private areas of the club" (id. at 292).  This evidence, without more, adequately supported the conclusion that the topless clubs retained a predominant sexual focus.

Ten's Cabaret and Pussycat Lounge argue that the City has offered no evidence of the character of the topless clubs before the 60/40 formula came into effect and has not met its burden of showing a lack of transformation in the clubs' character.  However, this Court's 2005 decision ordered the trial court to decide whether plaintiffs were predominantly sexual in focus at the time of trial, and this task did not require the City to adduce evidence as to their character in the past.

In short, once the standard is clarified, it is evident as a matter of law that the City met its burden of showing that the adult establishments continued to have a predominant focus on sexually explicit materials and activities.  It follows that the 2001 Amendments are facially constitutional.[3]

IX.

In the alternative, Ten's Cabaret and Pussycat Lounge

---

[3] We have considered plaintiffs' remaining arguments, and conclude that they lack merit.  We decline to accept the invitation of plaintiffs and amicus First Amendment Lawyers Association to reconsider our 2005 decision in this case.  We note, however, that there is no inconsistency between that opinion and Justice Kennedy's analysis of the relation between speech and secondary effects in his Alameda Books concurrence (see Alameda Books, 535 US at 449-450 [Kennedy, J., concurring]; see also Ben's Bar, Inc v Village of Somerset, 316 F3d 702, 721-722 [7th Cir 2003]).

contend that the 2001 Amendments, as applied to them, are unconstitutional.  In essence, the two companies argue that regardless of whether some of the other topless clubs inspected by the City continued to focus on sexual activities, they did not, insofar as they became hybrid entities, including independent nonadult clubs serving different clientele adjacent to the adult entertainment.  As the City points out, however, the as-applied challenge was not raised on the prior appeal (see 6 NY3d 63) and is not now reviewable (see New York Tel. Co. v Supervisor of Town of Oyster Bay, 35 AD3d 417, 418 [2d Dept 2006]; Katz v City of New York, 231 AD2d 448, 448 [1st Dept 1996]; see also Martin v Cohoes, 37 NY2d 162, 165-166 [1975]).

Accordingly, the order of the Appellate Division should be reversed, without costs, and judgment granted in favor of the City of New York in accordance with this opinion.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order reversed, without costs, and judgment granted in favor of the City of New York in accordance with the opinion herein. Opinion by Judge Fahey.  Judges Rivera, Stein, Garcia and Wilson concur.  Chief Judge DiFiore took no part.

Decided June 6, 2017